[No. S164614. Feb. 8, 2010.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF YUBA COUNTY, Respondent;
DUSTIN WILLIAM SPARKS, Real Party in Interest.

2

4

COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, John G. McLean, R. Todd Marshall and George M. Hendrickson, Deputy Attorneys General, for Petitioner.

Mitchell Keiter as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

S. Michelle May, under appointment by the Supreme Court; Scott and Heitman and Justin B. Scott for Real Party in Interest.

## OPINION

**CHIN, J.**—Real party in interest, Dustin William Sparks (hereafter defendant or Sparks), was charged with two felony murders. Before his case came to trial, two other persons were tried for the same murders. One was convicted of voluntary manslaughter, and the other was acquitted. Concerned about possible inconsistent verdicts, and applying the doctrine of nonmutual collateral estoppel adopted in a criminal case in *People v. Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622] (*Taylor*), the superior court ruled that those verdicts prohibit the prosecution from trying defendant for a crime greater than voluntary manslaughter.

■ We conclude that decisions postdating *Taylor*, supra, 12 Cal.3d 686, including decisions from this court and the United States Supreme Court, have undermined *Taylor*'s reasoning and the authority on which it relied. Occasional inconsistent jury verdicts are inevitable in our criminal justice system. If a verdict regarding one participant in alleged criminal conduct is inconsistent with other verdicts, all of the verdicts may stand. (*Standefer v. United States* (1980) 447 U.S. 10, 25–26 [64 L.Ed.2d 689, 100 S.Ct. 1999] (*Standefer*); *People v. Palmer* (2001) 24 Cal.4th 856, 860 [103 Cal.Rptr.2d 13, 15 P.3d 234] (*Palmer*).) Accordingly, a verdict regarding one defendant has no effect on the trial of a different defendant. Courts should determine the propriety of a prosecution based on that prosecution's own record, not a different record. Nonmutual collateral estoppel does not apply to verdicts in criminal cases.

We affirm the judgment of the Court of Appeal, which set aside the superior court's ruling, and overrule *People v. Taylor*, supra, 12 Cal.3d 686.

### I. FACTS AND PROCEDURAL HISTORY

Defendant was charged with two counts of felony murder based on a plan to steal marijuana plants that resulted in the killing of two people. Two other participants in the events leading to the deaths, Michael Huggins and Matthew Griffin, were tried separately for the murders before defendant's case came to trial. Griffin was acquitted and Huggins convicted of voluntary manslaughter.

The Court of Appeal summarized the evidence presented at Huggins's trial, which that court and this court have judicially noticed:

"In September 2005, Huggins lived in a house in Antelope with his girlfriend, Angelic Rampone, Matthew Griffin, and Griffin's girlfriend, Amy Butler. Levill Hill would sometimes spend the night at the house.

"In the house one day there was a discussion in which Butler told Griffin, Huggins, Rampone, and Hill that she knew of a house in Olivehurst where they could steal marijuana plants. The Olivehurst house belonged to Michael Hance. In back of the Olivehurst house was a trailer occupied by two men who had gone to school with Butler—Scott Davis and Michael Hance's son, Christopher Hance. Davis lived rent free in the trailer in exchange for guarding marijuana plants that were on the property.

"One evening in the beginning of September 2005, Butler, Griffin, Huggins, Rampone, and Hill drove to the Olivehurst house but decided not to steal the marijuana plants at that time. Later, Huggins, Griffin, and Butler talked about returning to the Olivehurst house, tying 'the boys up,' and trying to steal the marijuana plants. Butler said she wanted nothing more to do with the plan.

"In the early morning of September 27, Huggins, Rampone, Hill, and Griffin drove back to the Olivehurst house. En route, they picked up Huggins's cousin, Sparks. When they got to the Olivehurst house, they parked the car, and Huggins, Sparks, Griffin, and Hill got out. Huggins had a .45-caliber pistol and Sparks had a toy gun that looked real. Hill was handed duct tape and Griffin rope 'just in case' they needed to tie anybody up. Hill threw the duct tape back inside the car. They all then walked past the house and decided that none of them were going to go ahead with the plan to steal marijuana. They then split up in two groups—Huggins and Sparks ahead and Hill and Griffin behind—and all headed back toward the Olivehurst house.

"When they got to the house, however, Huggins kneeled down between the south and north gate to the house. Sparks stood right by Huggins. Hill and Griffin walked by them, and Hill asked what they were doing. Huggins replied, ' "We're going to do it." ' Hill responded, ' "No, you're not." ' Hill and Griffin then walked away. In Hill's view, he and Griffin abandoned the plan, but Huggins and Sparks did not.

"Huggins walked through the gate to the side of the house. Sparks stayed at the gate. While Sparks was at the gate, someone hit him.

"After Sparks was hit, Hill heard a gunshot. Hill and Griffin ran back to the car. Sparks and Huggins followed. They drove back to the Antelope house.

"Michael Hance was home at the time of the shooting and described what he heard and saw. He was in the house talking with his son while Davis was sleeping in the trailer. Michael and Christopher Hance heard one of the gates open, so Christopher went out to investigate. Michael Hance then heard 'scuffling' 'between the two gates' and heard a shot.

"Michael Hance ran outside and saw Huggins go into the trailer, heard 'some yelling,' and then 'a shot or two' inside the trailer. As Michael Hance started going toward the trailer, Christopher Hance, Huggins, and Davis 'poured out' of the trailer. Davis, who was holding his neck, fell to the ground.

"Michael Hance called 911. When police arrived, they found Davis dead. Christopher Hance was bleeding profusely from his lower abdomen and right leg and died from blood loss.

"Based on this and other evidence introduced at trial, the jury in Huggins's case was instructed on felony murder with the underlying felony being robbery or burglary or attempted robbery or burglary and on voluntary manslaughter based on intent to kill or conscious disregard for life. The jury found Huggins guilty of two counts of voluntary manslaughter while personally using a firearm."

As a result of the verdicts as to Huggins and Griffin, defendant moved to preclude the prosecution from trying him for any crime greater than voluntary manslaughter. He argued that collateral estoppel prevented the prosecution from relitigating issues decided in the previous trials.

In opposing the motion, the district attorney argued that evidence not admitted at the earlier trials could be used in defendant's trial. As the Court of Appeal summarized: "This evidence included statements made by Sparks during a police interview. In that interview, Sparks initially explained that he, Huggins, Griffin, and Hill all planned to participate in stealing the marijuana with his role being to 'grab the plants.' When they got to the street, Griffin got scared, 'punk[ed] out,' and went back to the car. Sparks and Huggins stood by the gate. Huggins went onto the property. As Sparks was standing outside the gate, he was confronted by someone wanting to know who he was, leading to a short physical altercation. Sparks then heard gunshots and ran back to the car. When Huggins returned to the car, he said to Sparks, '[W]here the Fuck were you a[t] Dustin?' Not wanting Huggins to think he 'just punked out,' Sparks said that he got into a fight." (Fn. omitted.)

The trial court, which had presided over Huggins's trial, granted defendant's motion. Relying largely on *Taylor*, *supra*, 12 Cal.3d 686, it found that collateral estoppel applied because it would preclude a "third trial on these same facts" and would prevent inconsistent judgments, thus "eliminat[ing] the risk of undermining the integrity of the justice system." It prevented the prosecution "from pursuing a conviction for homicide . . . on the basis [that] the homicides allegedly occurred during the commission of a robbery, burglary, or an attempt of either crime."

The People filed a petition for a writ of mandate in the Court of Appeal challenging the trial court's ruling. The Court of Appeal issued an alternative writ and ultimately a peremptory writ directing the superior court to vacate its order and to issue a new order denying defendant's motion to preclude the People from trying him for any crime greater than voluntary manslaughter.

We granted defendant's petition for review. We also directed the parties to brief the question of whether *Taylor, supra,* 12 Cal.3d 686, should be overruled.

## II.  Discussion

In *Taylor, supra,* 12 Cal.3d 686, three persons (Taylor, Daniels, and Smith) planned to rob a liquor store operated by Jack and Linda West. Taylor remained in the getaway car while the other two entered the store. There Daniels and Smith robbed the Wests at gunpoint of money in the cash register. In the process, a gun battle broke out in which the Wests shot Smith, killing him. (*Id.* at pp. 689–690.) We explained that, in an earlier opinion, we had held that Taylor could be prosecuted for Smith's murder "on a theory of vicarious liability if it independently appeared that his confederates entertained malice aforethought . . . ." (*Id.* at p. 691; see *Taylor v. Superior Court* (1970) 3 Cal.3d 578 [91 Cal.Rptr. 275, 477 P.2d 131].) However, before Taylor's trial, Daniels was tried for that murder and, although convicted of robbery, was acquitted of murder. In light of this verdict, this court held that principles of collateral estoppel prohibited Taylor from being tried for the same murder.

In overturning the trial court's ruling in this case, the Court of Appeal distinguished *Taylor*, partly on the basis that evidence admissible against defendant in his trial was not available in the prior trials of Huggins and Griffin. Defendant argues that *Taylor* is indistinguishable, and that the Court of Appeal erred in not applying it. Whether *Taylor* would apply to the facts of this case is a complex and difficult question. But we need not decide that question. As we discuss, intervening judicial decisions have deprived *Taylor* of any continuing validity. In *Palmer, supra,* 24 Cal.4th at page 866, we distinguished, but did not overrule, *Taylor* because there was no need to do so. But the time has come to overrule it entirely.

*Taylor* began its analysis by explaining that "[c]ollateral estoppel has been held to bar relitigation of an issue decided at a previous trial if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial." (*Taylor, supra,* 12 Cal.3d at

p. 691.) "As to the third requirement of identity of parties," *Taylor* continued, "it is the rule *in civil cases* that the party benefitting from collateral estoppel need not have been a party in the prior trial so long as the party bound by the doctrine was such a party. Mutuality is thus not required." (*Id.* at p. 692, italics added.) *Taylor* observed, however, that "courts have sometimes declined to apply the doctrine in behalf of a criminal defendant who was not involved in the prior trial." (*Ibid.*) This observation gave rise to the question of whether what is sometimes called "nonmutual collateral estoppel" applies in a criminal case, that is, whether a defendant can obtain the benefit of a *favorable* verdict involving a different person even though that defendant would not have been bound by an *unfavorable* verdict regarding that other person.

In support of applying collateral estoppel even when there is no identity of defendants, *Taylor* cited some out-of-state and federal cases applying the defense of collateral estoppel. (*Taylor, supra,* 12 Cal.3d at p. 693.) It also relied in part on cases that "have applied the doctrine to preclude the conviction of an alleged conspirator when all other alleged coconspirators have been acquitted [citation] or the charges against all the other coconspirators have been dismissed because of insufficient evidence [citation]." (*Id.* at pp. 694–695.)

In addition to citing supporting cases, *Taylor* identified three "strong policy considerations" behind the collateral estoppel doctrine: "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." (*Taylor, supra,* 12 Cal.3d at p. 695.)

Regarding the first of these considerations, the court explained that "[t]he need for judicial economy by minimizing repetitive litigation is even more important in criminal than in civil trials. Crowded court dockets inevitably will impose a heavy burden on criminal defendants as substantial periods of incarceration may result while they await trial, and long delays between arrest and sentencing will decrease the effectiveness of the punishment which is ultimately meted out. [Citation.] Although the saving of the resources of the court system may be somewhat reduced when, in addition to the crime against which a plea of collateral estoppel is urged, other crimes must also be litigated, the other goals of an application of the doctrine can nevertheless be achieved." (*Taylor, supra,* 12 Cal.3d at p. 695.)

Regarding the second of these considerations, the court explained that "[p]erhaps the most compelling reason for an application of collateral estoppel where vicarious liability is at issue is to prevent the compromising of the

integrity of the judicial system caused by the rendering of inconsistent verdicts. Criminal trials generally receive more publicity than civil ones, and the public's view of the judicial system in general is often shaped by the impression of the fairness of the criminal justice system in particular. [Citation.] Few things undermine the layman's faith in the integrity of our legal institutions more than the specter of a system which results in a person being punished for the acts of another, when the actor himself under identical charges had been previously exonerated from responsibility for those very acts. This is particularly so under the facts of the instant case when the People seek to punish defendant, who was not even present on the immediate scene, for the death of an accomplice caused by the acts of another confederate who himself has been exonerated." (*Taylor, supra*, 12 Cal.3d at pp. 695–696.)

The court acknowledged that "the third purpose of collateral estoppel, preventing harassment through vexatious litigation, does not appear to be fulfilled if the doctrine is applied when different defendants are tried but once in separate trials . . . ." (*Taylor, supra*, 12 Cal.3d at p. 696.) But it believed the "other general purposes" of the doctrine supported applying it under the circumstances of the case. (*Ibid.*) The court stressed that the defendant tried first "did not offer a defense such as insanity, intoxication, or duress based on his personal lack of culpability irrespective of the criminality of his acts" (*id.* at p. 697, fn. 13), and that the inconsistency in the verdicts "cannot be explained by differences in evidence or jury instructions" (*id.* at p. 698, fns. omitted). It noted that the "case therefore does not present the issue of whether and under what circumstances the prosecution's discovery of new evidence after the first trial will preclude a plea of collateral estoppel which otherwise may have been valid" (*id.* at p. 698, fn. 16), and it did "not reach the question of whether the bar of collateral estoppel is applicable when the People allege that the prior verdict of acquittal was based on erroneous rulings which they were unable to correct through appellate review" (*id.* at p. 698, fn. 17).

Under these circumstances—where the prior trial involved no defense personal to the defendant, there was no difference in evidence between the trials, and there was no claim the prior acquittal was based on erroneous rulings—*Taylor* "conclude[d] that the lack of identity of parties defendant does not preclude the application of the doctrine of collateral estoppel; we limit today's holding to the particular circumstances of the instant case where an accused's guilt must be predicated on his vicarious liability for the acts of a previously acquitted confederate." (*Taylor, supra*, 12 Cal.3d at p. 698.)

Six years after *Taylor*, the United States Supreme Court refused to apply nonmutual collateral estoppel to a criminal case. (*Standefer, supra*, 447 U.S.

10.) The *Standefer* court described the issue as being "whether a defendant accused of aiding and abetting in the commission of a federal offense may be convicted after the named principal has been acquitted of that offense." (*Id.* at p. 11.) As we explained in *Palmer*, in *Standefer*, "the petitioner was convicted of aiding and abetting a crime despite the fact that the alleged actual perpetrator, Niederberger, had previously been acquitted of that crime in a different prosecution. Relying on the doctrine of nonmutual collateral estoppel, the petitioner argued that the prior acquittal precluded the government from relitigating the question of the actual perpetrator's guilt." (*Palmer, supra,* 24 Cal.4th at p. 862.) The high court had granted certiorari because of the importance of the issue and the existence of conflicting federal decisions. (*Standefer, supra,* at p. 14.) The court cited, and ultimately implicitly disapproved, two cases that had applied collateral estoppel in similar circumstances. (*Id.* at p. 14, fn. 7.) The *Taylor* court had cited those same cases in support of its ruling. (*Taylor, supra,* 12 Cal.3d at p. 693.)

The *Standefer* court noted (as had *Taylor, supra,* 12 Cal.3d at p. 692) that the doctrine of nonmutual collateral estoppel first arose in civil cases. (*Standefer, supra,* 447 U.S. at p. 21.) But, unlike the court in *Taylor,* the high court in *Standefer* refused to extend the doctrine to criminal cases; it refused to give a verdict regarding one defendant preclusive effect on the trial of a different defendant. "This, however, is a criminal case, presenting considerations different from those in [the civil cases it had cited]. First, in a criminal case, the Government is often without the kind of 'full and fair opportunity to litigate' that is a prerequisite of estoppel." (*Standefer, supra,* at p. 22.) The court noted that the prosecution has limited discovery rights, cannot obtain a directed verdict or judgment notwithstanding the verdict no matter how clear the evidence of guilt, and cannot appeal an adverse verdict. "The absence of these remedial procedures in criminal cases permits juries to acquit out of compassion or compromise or because of ' "their assumption of a power which they had no right to exercise, but to which they were disposed through lenity." ' " (*Ibid.*) The court explained that "in a criminal case the Government has no . . . avenue to correct errors. Under contemporary principles of collateral estoppel, this factor strongly militates against giving an acquittal preclusive effect." (*Id.* at p. 23.)

The court also noted that sometimes evidence is available in one case against one defendant that is not available in another case against another defendant. The unavailability of evidence in the one case may result in an acquittal that might not occur in a trial where the evidence was available. In these circumstances, the court explained, "application of nonmutual estoppel would be plainly unwarranted. [¶] It is argued that this concern could be met on a case-by-case basis by conducting a pretrial hearing to determine whether any such evidentiary ruling had deprived the Government of an opportunity to present its case fully the first time around. That process, however, could

prove protracted and burdensome. Under such a scheme, the Government presumably would be entitled to seek review of any adverse evidentiary ruling rendered in the first proceeding and of any aspect of the jury charge in that case that worked to its detriment. Nothing short of that would insure that its opportunity to litigate had been 'full and fair.' If so, the 'pretrial hearing' would fast become a substitute for appellate review, and the very purpose of litigation economy that estoppel is designed to promote would be frustrated." (*Standefer, supra*, 447 U.S. at p. 24, fn. omitted.)

The high court also noted "the important federal interest in the enforcement of the criminal law." (*Standefer, supra*, 447 U.S. at p. 24.) It quoted with approval from the Third Circuit Court of Appeals opinion: " 'To plead crowded dockets as an excuse for not trying criminal defendants is in our view neither in the best interests of the courts, nor the public.' " (*Id.* at p. 25.) The high court then noted, "In short, this criminal case involves 'competing policy considerations' that outweigh the economy concerns that undergird the estoppel doctrine." (*Ibid.*)

■ The *Standefer* court explained that in denying preclusive effect to the actual perpetrator's acquittal, it did "not deviate from the sound teaching that 'justice must satisfy the appearance of justice.' [Citation.] This case does no more than manifest the simple, if discomforting, reality that 'different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system.' [Citation.] While symmetry of results may be intellectually satisfying, it is not required. [Citation.] [¶] Here, petitioner received a fair trial at which the Government bore the burden of proving beyond reasonable doubt that Niederberger violated [the statute] and that petitioner aided and abetted him in that venture. He was entitled to no less—and to no more." (*Standefer, supra*, 447 U.S. at pp. 25–26.)

■ *Standefer, supra*, 447 U.S. 10, was based on federal law and is not binding on this court in interpreting state law. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1126 [17 Cal.Rptr.2d 365, 847 P.2d 45].) California is permitted to have a collateral estoppel rule more favorable to criminal defendants than the federal rule. "Nevertheless, a decision by the United States Supreme Court, and especially a unanimous one such as [*Standefer*] . . . , is entitled to 'respectful consideration.' " (*Ibid.*, quoting *People v. Teresinski* (1982) 30 Cal.3d 822, 836 [180 Cal.Rptr. 617, 640 P.2d 753].) After careful consideration, we find *Standefer* persuasive.

■ Indeed, we have already found *Standefer* persuasive. In *Palmer, supra*, 24 Cal.4th 856, defendants Price and Palmer were tried together, but with separate juries, for various crimes they committed together, including one count of conspiracy to murder. One jury convicted Price of all charges,

including the conspiracy charge, but the other jury acquitted Palmer of the conspiracy charge, although it convicted him of other charges. There was no evidence anyone other than Price and Palmer was involved in the alleged conspiracy. Price contended that "the so-called rule of consistency—that the acquittal of all alleged coconspirators but one requires acquittal of the remaining alleged conspirator"—required reversal of his conspiracy conviction. (*Id.* at p. 858.) We concluded "that the rule of consistency is a vestige of the past with no continuing validity. Many reasons may explain apparently inconsistent verdicts: lenience, compromise, differing evidence as to different defendants, or, possibly, that two juries simply viewed similar evidence differently. If substantial evidence supports a jury verdict as to one defendant, that verdict may stand despite an apparently inconsistent verdict as to another defendant." (*Ibid.*)

Relying on a number of California and federal cases holding that inconsistent verdicts may stand—some involving multiple defendants and some involving multiple verdicts as to a single defendant—we explained that "[t]he law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*Palmer, supra,* 24 Cal.4th at p. 860.)

We relied heavily on the reasoning of *Standefer, supra,* 447 U.S. 10, as well as *United States v. Powell* (1984) 469 U.S. 57 [83 L.Ed.2d 461, 105 S.Ct. 471] (*Powell*), a case in which the high court held—for many of the same reasons it had given in *Standefer*—that the criminal justice system must accept inconsistent verdicts as to a single defendant. (*Palmer, supra,* 24 Cal.4th at pp. 862–864.) We quoted *Powell* as noting " 'that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.' " (*Palmer, supra,* at pp. 863–864, quoting *Powell, supra,* at p. 67.)

*Palmer* further explained that "[o]ur criminal justice system, which permits a conviction only if the jury unanimously finds beyond a reasonable doubt

that a defendant is guilty of the particular charge, gives the defendant the benefit of the doubt. Moreover, a jury clearly has the unreviewable *power*, if not the right, to acquit whatever the evidence. An inevitable result of this system, and one that society accepts in its quest to avoid convicting the innocent, is that some criminal defendants who are guilty will be found not guilty. This circumstance does not, however, mean that if one person receives lenient treatment from the system, all must." (*Palmer, supra,* 24 Cal.4th at p. 865.)

*Palmer* rejected Price's reliance on *Taylor, supra,* 12 Cal.3d 686. We concluded that the three purposes of collateral estoppel that *Taylor* cited did not warrant extending its holding to Price's situation. "Reversing Price's conviction would not serve judicial economy; this case was litigated once, not repetitively. The rule of consistency cannot prevent an inconsistent verdict that has already occurred; the only question that remains is what to do with that verdict. Nothing about this case hints at vexatious litigation; defendant was tried but once on good, credible evidence. Moreover, occasional inconsistent verdicts do not undermine the integrity of our criminal justice system but are an inevitable consequence of that system. Indeed, a 'rule that could promote the duplication of an erroneous acquittal to all persons who participate in a criminal transaction' [citation] might itself undermine the system more than accepting inconsistent verdicts once they have occurred." (*Palmer, supra,* 24 Cal.4th at p. 866.)

*Palmer* specifically disapproved Court of Appeal decisions that had applied the rule of consistency, including the two cases *Taylor* had cited in this regard to support its own conclusion. (*Palmer, supra,* 24 Cal.4th at pp. 861, 867; see *Taylor, supra,* 12 Cal.3d at p. 695.)

It is readily apparent that little remains of the foundation on which *Taylor* based its conclusion. Most of the authority *Taylor* cited has now been disapproved, either implicitly by the high court in *Standefer, supra,* 447 U.S. 10, or expressly by this court in *Palmer, supra,* 24 Cal.4th 856. The high court in *Standefer,* although not citing *Taylor,* rejected all of its reasoning. In *Palmer,* we rejected what *Taylor* described as "[p]erhaps the most compelling reason" for its conclusion, namely preventing a perceived compromising of the integrity of the judicial system. (*Taylor, supra,* 12 Cal.3d at p. 695.) Courts of this state that have considered *Taylor* have generally distinguished it and limited it to its very narrow factual scenario. In *People v. Howard* (1988) 44 Cal.3d 375, 412 [243 Cal.Rptr. 842, 749 P.2d 279], for example, we said that "*Taylor* is of limited application," and that the "general rule is that acquittal of one codefendant normally will not require acquittal of another." (See also *People v. Lawley* (2002) 27 Cal.4th 102, 163–164 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Garrison* (1989) 47 Cal.3d 746,

781–782 [254 Cal.Rptr. 257, 765 P.2d 419].) Even a Court of Appeal refused to apply *Taylor* to the closely similar situation where the actual shooter was acquitted, but an aider and abettor convicted, of the same murder. (*People v. Wilkins* (1994) 26 Cal.App.4th 1089 [31 Cal.Rptr.2d 764].) Except for cases we disapproved in *Palmer, supra,* 24 Cal.4th 856, we are aware of no reported California case that actually followed *Taylor.*

*Palmer* is distinguishable from this case and from *Taylor.* In *Palmer*, the inconsistent verdicts occurred simultaneously, so *Taylor*'s judicial economy rationale was not implicated. As we noted in *Palmer*, no rule can prevent an inconsistent verdict that has already occurred. (*Palmer, supra,* 24 Cal.4th at p. 866.) Here, defendant has not yet been tried, so the judicial economy rationale may apply.

*Taylor*'s judicial economy rationale, however, does not warrant a departure from the general rule enunciated in *Palmer* and other cases that an acquittal of one defendant has no preclusive effect on another defendant. We do not know how many, if any, trials never occurred due to *Taylor*, but over the years the decision itself has *generated* much litigation, generally resulting, at least at the appellate level, in *Taylor* being distinguished rather than followed. Moreover, if, as *Taylor* itself suggested, its rule would require examination of the prior trial's record to determine whether the acquitted defendant had proffered a defense personal to that defendant, or whether judicial error had occurred, or whether the evidence at the new trial might be different than at the prior trial (as the Court of Appeal found in this case), that examination would itself create substantial additional litigation which, as the high court pointed out, would frustrate "the very purpose of litigation economy that estoppel is designed to promote . . . ." (*Standefer, supra,* 447 U.S. at p. 24.) Thus, *Taylor* may actually have caused more litigation than it prevented.

This case presents a good example of *Taylor*'s inefficiencies. In deciding whether *Taylor* applies here, the Court of Appeal judicially noticed, and extensively reviewed, the appellate record in Huggins's case. At defendant's request, we have judicially noticed that same record. The parties' briefs discuss and analyze that record in detail. Defendant also asked us to judicially notice the record of Griffin's trial. But because Griffin was acquitted, no appellate record currently exists. No one appeals an acquittal. Thus, for us to analyze Griffin's trial, a record of that case would have to have been created. Because no appellate record of Griffin's trial currently exists, and the Court of Appeal had not noticed the record of that case, we denied defendant's request to notice that record, but without prejudice to a party's citing the trial court's discussion of Griffin's trial or arguing that the Court of Appeal should have noticed that record. In his brief on the merits in this court, defendant no longer relies on Griffin's trial or acquittal. But in many cases involving

collateral estoppel, a record of a trial resulting in an acquittal might have to be prepared. Doing so solely to decide whether the acquittal should have preclusive effect on another case would hardly further judicial economy.

Additionally, here the trial court did not preclude a trial but merely reduced the seriousness of the charge. Another full trial would be needed even under the trial court's ruling. Thus, in this case, applying *Taylor* has *caused* much litigation and much expenditure of judicial resources. Because a trial would be required in any event, whether the trial court's ruling would have saved *any* resources is questionable. On balance, we can confidently say that it would have been much more sparing of judicial resources simply to have tried defendant long ago.

█ Moreover, even if we were to assume that the *Taylor* rule might occasionally save some judicial resources, as the high court also pointed out, it is not in the best interests of the courts or public to use judicial economy as a reason not to try criminal defendants. (*Standefer, supra,* 447 U.S. at p. 25.)

█ Distinguishing *Palmer* on the basis that here no inconsistent verdict has yet occurred would also have the unfortunate effect of making collateral estoppel's application turn on the happenstance of which trial goes first. If this defendant had been tried first and convicted of murder, and the other two participants tried later, then *Palmer* would compel acceptance of defendant's conviction even if it were inconsistent with the later verdicts. As we have explained, occasional inconsistent verdicts do not undermine the integrity of the justice system. But a rule that defendants can assert the preclusive effect of other trials if, and only if, their trial was scheduled to go later than the other trials would, we believe, itself cast discredit on that system. It would mean that, of two participants in an alleged criminal enterprise, the one tried first would have only one trial in which to prevail—that participant's own trial; but the participant scheduled to be tried second might have *two* trials in which to prevail—either the first or the second trial. If, instead, both participants were tried together, *neither* could benefit from an inconsistent verdict. (*Palmer, supra,* 24 Cal.4th 856.) Such a system would give the appearance of arbitrariness, not integrity. Accordingly, the appearance of justice the criminal justice system needs is best served if all participants in alleged criminal conduct are tried on their cases' own merits, without concern for the results of other trials.

Applying the doctrine of nonmutual collateral estoppel would have another unfortunate effect on the criminal justice system. Because no criminal defendant can be bound by an *adverse* factual finding in a trial in which that defendant did not participate, retention of nonmutual collateral estoppel in criminal cases creates what we might call a one-way ratchet. That is, if the

first coconspirator to be tried receives a favorable verdict, that verdict, if given collateral estoppel effect, ratchets down the potential punishment for other defendants whose trials might follow; in contrast, because nonmutual collateral estoppel would apply against the prosecution but not against any defendant, if the first coconspirator received an unfavorable verdict, additional defendants would still be fully eligible to argue for acquittal or a lesser punishment. All defendants may thus receive the benefit of the most favorable verdict any jury might render (provided they time their trials correctly). Nothing in our jury system suggests such a scale tipping is either compelled or beneficial. A rule that can extend the effect of an erroneous acquittal to all persons who participated in the criminal enterprise might undermine the system more than accepting the potential for inconsistent verdicts. (*Palmer, supra,* 24 Cal.4th at p. 866.)

Stressing the narrowness of *Taylor*'s holding, defendant seeks to distinguish its facts from both *Standefer, supra,* 447 U.S. 10, and *Palmer, supra,* 24 Cal.4th 856. He argues that the latter cases involve aider-and-abettor or coconspirator liability (that is, liability for *intended* crimes) and not, like *Taylor,* true vicarious liability (that is, liability for *unintended* crimes under the natural and probable consequences doctrine). (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210].) Attempting to draw an analogy to civil cases, he argues that even if we reject nonmutual collateral estoppel everywhere else in the criminal realm, we should preserve it for cases like *Taylor*. We disagree. The reasons that caused the high court in *Standefer* to reject nonmutual collateral estoppel in criminal cases, as well as our reasoning in accepting inconsistent verdicts in *Palmer,* apply no matter what the basis for criminal liability is. If the liability in *Taylor* was truly vicarious, that merely means that Daniels's not guilty verdict was inconsistent with Taylor's guilty verdict. But, as both the high court and this court have already held, the criminal justice system must accept inconsistent verdicts. Moreover, if an evidentiary hearing, or perhaps a jury trial, were necessary to determine a defendant's precise intent in order to decide whether collateral estoppel applies, the system would be particularly inefficient, contrary to the doctrine's supposed benefit of saving judicial resources.

There are, certainly, factual differences among the cases. But, crucially, in both *Standefer, supra,* 447 U.S. 10, and *Palmer, supra,* 24 Cal.4th 856, the verdicts regarding the coperpetrators, if given preclusive effect, would have meant the defendant could not have been guilty of the same charges. Defendant argues that "under the *Huggins* jury's verdicts, it was factually and legally impossible for Huggins to be innocent of felony-murder, but Mr. Sparks to be guilty." We may assume this to be true. But, similarly, under the jury's acquittal of Niederberger in *Standefer,* it was impossible for the defendant to be guilty of aiding and abetting crimes that never occurred, and in *Palmer,* under the jury's acquittal of Palmer of conspiracy, it was impos-

sible for Price to have been guilty of conspiring with himself. *Standefer*'s and *Palmer*'s rationale supports denying preclusive effect to *any* verdict regarding a different criminal defendant, a conclusion at odds with *Taylor, supra,* 12 Cal.3d 686.

Defendant also cites *People v. Caesar* (2008) 167 Cal.App.4th 1050 [84 Cal.Rptr.3d 663]. In that case, Caesar and Godbolt were tried together. As relevant, the jury convicted both of the attempted murder of Clayton. Caesar's guilt was solely based on the theory that he was guilty of Godbolt's attempted murder of Clayton on an aiding and abetting theory. The jury found the attempted murder was premeditated as to Caesar but *not* premeditated as to Godbolt. The Court of Appeal reduced Caesar's attempted murder conviction to unpremeditated attempted murder because the premeditation finding as to Godbolt was inconsistent with the premeditation finding as to Caesar. The court reasoned that "because the jury made an explicit finding that Godbolt did *not* act with premeditation in attempting to murder Clayton," it "did not make the necessary finding to convict Caesar of attempted *premeditated* murder under the natural and probable consequences doctrine." (*Id.* at p. 1059.) The court distinguished our decision in *People v. McCoy, supra,* 25 Cal.4th 1111, where we held that, under some circumstances, an aider and abettor may be convicted of a greater crime than the actual perpetrator. (*People v. Caesar, supra,* at p. 1057.) But it did not cite *Palmer, supra,* 24 Cal.4th 856, or consider whether inconsistent verdicts as to separate defendants may be given effect. Instead, it made the " 'precipitous leap' " from a finding that the verdicts were inconsistent "to a rule requiring reversal of the inconsistent verdict . . . ." (*Palmer, supra,* at p. 864, quoting *U.S. v. Andrews* (11th Cir. 1988) 850 F.2d 1557, 1560.) We disapprove *People v. Caesar, supra,* 167 Cal.App.4th 1050, to the extent it is inconsistent with *Palmer* or this opinion.

Courts from other states that have considered *Taylor, supra,* 12 Cal.3d 686, have also generally distinguished it or rejected it, or both. Indeed, the cases postdating *Standefer, supra,* 447 U.S. 10, have uniformly followed *Standefer* rather than *Taylor.* (See *Kott v. State* (Alaska 1984) 678 P.2d 386, 392–393 [affirming the Alaska Court of Appeal's decision, which had rejected the defendant's collateral estoppel argument]; *State v. Kott* (Alaska Ct.App. 1981) 636 P.2d 622, 626–627 [the court of appeal decision affirmed in *Kott v. State,* finding *Taylor* "distinguishable on its facts" but "prefer[ring] to reject its holding"]; *State v. Jimenez* (1981) 130 Ariz. 138 [634 P.2d 950, 952–953] [both distinguishing and disagreeing with *Taylor*]; *Jared v. State* (1986) 17 Ark. App. 223 [707 S.W.2d 325, 328] ["The rule in *Taylor* simply is contrary to that which governs in Arkansas."]; *People v. Allee* (Colo. 1987) 740 P.2d 1, 5–6 [agreeing with "almost all jurisdictions [that] continue to require mutuality of parties in criminal proceedings" and dismissing *Taylor* with a "[b]ut

see" citation]; *State v. Santiago* (2005) 275 Conn. 192 [881 A.2d 222, 229–230, fn. 21] [finding *Taylor* not persuasive]; *Potts v. State* (Fla.Dist.Ct.App. 1981) 403 So.2d 443, 445 [rejecting *Taylor* and stating that "the acquittal of appellant's confederate of the assault has no bearing on the disposition of the charge against appellant"]; *People v. Franklin* (1995) 167 Ill.2d 1 [212 Ill.Dec. 153, 656 N.E.2d 750, 755] [following what it described as "[m]ost" courts in refusing to apply collateral estoppel and dismissing *Taylor* with a "but see" citation]; *Commonwealth v. Scala* (1979) 8 Mass.App.Ct. 202 [392 N.E.2d 869, 873] [rejecting the application of collateral estoppel and dismissing *Taylor* with a "[c]ontrast" citation]; *People v. Paige* (1983) 131 Mich.App. 34 [345 N.W.2d 639, 641] [finding *Taylor* not persuasive]; *State v. Hall* (Mo.Ct.App. 1985) 687 S.W.2d 924, 926 [rejecting a collateral estoppel contention without citing *Taylor*]; see also *State v. Hall*, at pp. 930–931 (conc. opn. of Clark, J.) [discussing the issue in greater detail and citing *Taylor* but rejecting it in favor of *Standefer*]; *Larsen v. State* (1977) 93 Nev. 397 [566 P.2d 413, 414 & fn. 2] [saying that generally collateral estoppel does not apply in criminal cases, citing *Taylor* for the proposition that "[t]here may be special circumstances which warrant deviation from this rule," but finding no such circumstances in the case]; *State v. Campbell* (1982) 56 Or.App. 527 [642 P.2d 346, 348] [rejecting *Taylor* in favor of the "policy considerations" articulated in *Standefer*, and concluding "that the rule requiring mutual identity of parties in criminal cases should be retained"]; *Commonwealth v. Brown* (1977) 473 Pa. 458 [375 A.2d 331, 335] [finding *Taylor*'s reasoning "unpersuasive"]; *State v. Mullin-Coston* (2004) 152 Wn.2d 107 [95 P.3d 321].)

One of the most recent of these cases, the Washington Supreme Court's opinion in *State v. Mullin-Coston, supra,* 95 P.3d 321, discussed the issue extensively. It viewed our decision in *Palmer, supra,* 24 Cal.4th 856, as having already "rejected *Taylor*." (*Mullin-Coston, supra,* at p. 327.) It then said, "California is not alone; the overwhelming majority of courts to confront the issue have held that issues decided by one defendant's jury are not binding in the subsequent prosecution of a different defendant. We agree with all of those courts and the United States Supreme Court; the public interest in the justice of criminal results outweighs the interest in judicial economy." (*Ibid.,* fn. omitted.)

We are aware of only two cases, both predating *Standefer, supra,* 447 U.S. 10, that appear to follow *Taylor, supra,* 12 Cal.3d 686 at all, and they are readily distinguishable. The first of these cases, *State v. Gonzalez* (1977) 75 N.J. 181 [380 A.2d 1128], did not involve jury trials but court rulings regarding identical suppression motions based on the same facts brought separately by two defendants. One court had granted the motion as to one defendant, but a different court later denied the same motion as to the second defendant. In the second defendant's appeal, the New Jersey Supreme Court

expressed "misgivings as to the broader implications of extending the collateral estoppel doctrine" (*id.*, 380 A.2d at p. 1135) but it found under the "exceptional circumstances" of the case—including the facts that the second defendant had failed to join in the first suppression motion through no fault of his own, and that the State could have, but had not, appealed the adverse suppression ruling—that it should give collateral estoppel effect to the earlier suppression ruling. (*Ibid.*) In support of this conclusion, it simply cited *Taylor* with the signal "cf." (*Gonzalez, supra,* at p. 1135.) *Gonzalez* thus provides no support for extending collateral estoppel to a jury verdict in a criminal case. (We express no opinion on whether collateral estoppel might apply in a situation not involving nonappealable rulings.)

The second of these cases, *People v. Felton* (N.Y.Sup.Ct. 1978) 95 Misc.2d 960 [408 N.Y.S.2d 646], is the only case following *Taylor* that involved a jury verdict. But even that case is distinguishable. In *Felton*, the defendant had originally been tried with a codefendant. The jury in the earlier trial had found the codefendant not guilty of a certain charge but could not reach a verdict on that charge as to the defendant. The appellate court concluded that the codefendant's acquittal had collateral estoppel effect in the defendant's case and cited *Taylor, supra,* 12 Cal.3d 686, to support its conclusion. But it pointedly based its conclusion on the fact that the defendant had participated in the earlier trial, and it cautioned that it was not going "so far as to rule that a 'total stranger' to a prior proceeding would be entitled to invoke the relief sought herein." (*Felton, supra,* 408 N.Y.S.2d at p. 649.) "To extend the doctrine to a 'stranger,' " the court explained, "would create an incentive for co-defendants to schedule motions and trials consecutively so as to capitalize on any favorable rulings rendered in the prior proceeding. This would only serve to pervert the underlying policies of collateral estoppel." (*Ibid.*) In this case, defendant did not participate in, but was a "stranger" to, the trials of his alleged coparticipants. Thus, even *Felton* does not aid him. Moreover, in light of the other authorities and reasons we have cited, we find *Felton* unpersuasive.

■ Defendant argues that the doctrine of stare decisis militates against overruling *Taylor, supra,* 12 Cal.3d 686. (See *People v. Garcia* (2006) 39 Cal.4th 1070, 1080 [48 Cal.Rptr.3d 75, 141 P.3d 197].) But "the doctrine is flexible, and 'permits this court to reconsider, and ultimately to depart from, our own prior precedent in an appropriate case.' " (*People v. King* (1993) 5 Cal.4th 59, 78 [19 Cal.Rptr.2d 233, 851 P.2d 27].) As we have explained, *Taylor* has almost never been followed, and its rationale and the authorities it cited have now been largely discredited. Defendant claims we "strongly reiterated" *Taylor* 19 years ago in *Lucido v. Superior Court* (1990) 51 Cal.3d 335 [272 Cal.Rptr. 767, 795 P.2d 1223]. *Lucido,* which involved an entirely different collateral estoppel issue, did, indeed, cite *Taylor* and quote its rationale. But then it distinguished *Taylor* and refused to extend it to its own

situation. (*Lucido, supra*, at pp. 347, 350–351.) Citing and distinguishing a case is not strongly reiterating it. Instead, we rejected *Taylor*'s main rationale in *Palmer, supra*, 24 Cal.4th 856.

Defendant notes that the Legislature has never acted to overturn *Taylor, supra*, 12 Cal.3d 686, in the 35 years since it was decided and cites this inaction as a reason not to overturn it. In some situations, legislative acquiescence might support a conclusion the Legislature has effectively ratified a judicial interpretation of a statute. (E.g., *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 178 [83 Cal.Rptr.2d 548, 973 P.2d 527]; but see *People v. Farley* (2009) 46 Cal.4th 1053, 1120 [96 Cal.Rptr.3d 191, 210 P.3d 361].) *Taylor*, however, interpreted no statute. It extended a *judicial* doctrine developed in civil cases to the criminal realm. *Taylor* did not claim a constitutional basis for its ruling, so presumably the Legislature could have overturned it if the question had come before it, and it had wished to do so. But because *Taylor* extended a judicial doctrine, and did not interpret a statute, it is primarily up to the courts to reconsider its correctness.

Finally, citing *People v. Morante* (1999) 20 Cal.4th 403 [84 Cal.Rptr.2d 665, 975 P.2d 1071], defendant argues that if we overrule *Taylor, supra*, 12 Cal.3d 686, we can do so only prospectively. *Morante* explained that "a judicial enlargement of a criminal statute that is not foreseeable, 'applied retroactively, operates in the same manner as an ex post facto law. [Citation.]' [Citations.] Holding a defendant criminally liable for conduct that he or she could not reasonably anticipate would be proscribed, 'violates due process because the law must give sufficient warning so that individuals "may conduct themselves so as to avoid that which is forbidden." [Citation.]' [Citations.] '[A] state Supreme Court, no less than a state Legislature, is barred from making conduct criminal which was innocent when it occurred, through the process of judicial interpretation. . . .' [Citation.]" (*People v. Morante, supra*, at p. 431.) For similar reasons, concerns about stare decisis are "at their acme . . . where reliance interests are involved . . . ." (*Payne v. Tennessee* (1991) 501 U.S. 808, 828 [115 L.Ed.2d 720, 111 S.Ct. 2597]; accord, *People v. King, supra*, 5 Cal.4th at p. 78 [overruling a previous opinion of this court but doing so only prospectively due to reliance and ex post facto concerns].)

These concerns are not implicated here. Overruling *Taylor* will not criminalize conduct that had been innocent. Murder has always been a crime. At the time of the alleged crime, defendant could not have relied on the fact that Huggins would be tried before him or on the verdict as to Huggins, for that trial and that verdict had not yet occurred. Reliance is of less concern in cases "involving procedural and evidentiary rules." (*Payne v. Tennessee, supra*,

501 U.S. at p. 828.) No doctrine requires that defendant receive the benefit of *Taylor*'s collateral estoppel holding.

### III. CONCLUSION

We affirm the judgment of the Court of Appeal and overrule *People v. Taylor, supra*, 12 Cal.3d 686.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

The petition of real party in interest for a rehearing was denied March 30, 2010.