Filed 5/21/21  P. v. Hernandez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B304340 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA127879-02) |
| v. | |
| ENRIQUE HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

Janet Gusdorff, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Enrique Hernandez, convicted of second degree murder in 2014, appeals the denial of his petition for resentencing pursuant to Penal Code section 1170.95[1] following an evidentiary hearing at which the superior court found the People proved beyond a reasonable doubt that Hernandez had acted with malice when he participated in the murder of Jonathan Sandoval and, therefore, was ineligible for relief. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Hernandez's Murder Conviction*

Our opinion affirming Hernandez's second degree murder conviction (*People v. Rangel* (June 27, 2016, B258940) [nonpub. opn.]) describes in detail the evidence presented at trial, which formed the basis for the superior court's decision denying Hernandez's petition for resentencing.

An information charged Hernandez, his younger brother Jesus Hernandez[2] and Jose Rangel with murder (§ 187), specially alleged each of them, or a principal, had personally used and intentionally discharged a firearm causing death (§ 12022.53, subds. (b), (c), (d) & (e)(1)), and also alleged the murder had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The three men were tried jointly; Jesus and Rangel to one jury; Hernandez to a separate jury. Jesus and Rangel were convicted of first degree murder; Hernandez of

---

[1]     Statutory references are to this code.

[2]     For clarity we refer to Enrique Hernandez as Hernandez and to Jesus Hernandez as Jesus.

2

second degree murder.  Both juries found true the specially alleged firearm-use and criminal street gang enhancements.[3]

      a.  *The shooting*

Hernandez, Rangel and Jesus were members of Unos Sin Verguenza (USV), a criminal street gang.  On April 11, 2013 two members of the East Side Paramount (ESP) gang, a rival of USV, beat up then-18-year-old Jesus as he walked home from Paramount High School with his girlfriend.  Later that day Jesus sent a text message to his friend Rangel, telling him about the fight.  Rangel responded that he was "hunting those cheese puffs right now."  Cheese puffs is a derogatory term for ESP gang members.  Jesus texted Rangel, "[D]on't trip . . . .  I got them tomorrow."  Rangel replied in his text message, "Say no mo."

The next afternoon Rangel texted Jesus to tell him he was one block away from Paramount High School in ESP territory.  He stated, "[I]t's hot," meaning law enforcement was in the area, and "I got the thing with me," meaning Rangel had a gun.  Jesus replied in his text message, "I'll be out right now."

Hernandez picked up Jesus and Rangel, and the three of them drove through ESP territory looking for ESP gang members.  They spotted Sandoval crossing the street near Downey Avenue and Monroe Street.  Sandoval was an ESP gang member, although not one of Jesus's assailants from the previous day.  Hernandez stopped the car, and Rangel jumped out with his arm outstretched pointing his gun at Sandoval.  He quickly fired four to five gunshots at Sandoval, killing him.  Rangel

---

[3]     Hernandez was sentenced to an aggregate indeterminate state prison term of 40 years to life.  Rangel and Jesus were each sentenced to aggregate indeterminate state prison terms of 50 years to life.

immediately got back into the car, and the three men sped away. A witness saw the shooting and followed Hernandez's car for a short while, but stopped the chase after nearly colliding with another car.

A short time after the shooting, Jesus met his brother Ricardo's friend Braiant Mejia at Mejia's house and told Mejia, "We just smoked someone," which Mejia understood meant they had killed someone. Jesus gave Mejia a gun wrapped in a shirt or fabric and asked him to hide it in his house. Before leaving Mejia's house, Jesus borrowed Mejia's cell phone and made three calls, one of which was to Hernandez. Mejia heard Jesus tell Hernandez, "Relax. It's all good. We're okay." He also overheard Hernandez telling Jesus, "We're not good. Someone saw us."

      b. *Hernandez's custodial interview*

During a recorded interview with the police, played for his jury, Hernandez denied he was a USV gang member but admitted he had been a member of a tagging crew associated with the USV gang.

The day before the shooting Jesus had called Hernandez and told him he had been jumped by three ESP gang members. Jesus's assailants had also threatened him. Concerned about his younger brother, Hernandez picked Jesus up from school the day after the attack. He planned to find and talk to the individuals who had threatened Jesus. He intended only to demonstrate a show of support for his brother and, perhaps, engage in a fistfight with Jesus's attackers; he was not armed and did not intend to shoot anyone.

While they were driving in Hernandez's car, Jesus called Rangel; and they went to pick him up. Hernandez did not know

4

Rangel. As the three were driving, Rangel spotted Sandoval and declared, "There he is." Hernandez made a couple of U-turns and planned to stop the car and confront the man. Suddenly, Rangel said, "I got this." He jumped out of the car and started shooting at Sandoval. Hernandez was in shock. He explained he did not know Rangel had a gun. Later in the interview, however, he admitted he knew a couple of minutes before the shooting that Rangel had a gun.

c. *The People's gang expert*

The People's gang expert, given a hypothetical resembling the facts of this case, testified the shooting was conducted in retaliation for the earlier attack on Jesus and committed to benefit the USV gang. The expert explained retaliation, at the same or higher level of violence, was necessary in gang culture to protect and enhance the gang's reputation and prevent future assaults.

d. *Jesus's testimony*

Jesus testified in his own defense. His testimony was admitted before both juries. Jesus claimed he was a member of a tagging crew and an associate, not a member, of USV.

According to Jesus, the day after he was assaulted, several ESP members drove by him after school brandishing what appeared to be a weapon. Jesus was frightened and called Hernandez to pick him up from school. They drove together for a while attempting to find the men who had assaulted him the previous day, but were unsuccessful and soon abandoned that effort.

On the way home Jesus saw Rangel on the street near Jesus's house. He and Hernandez agreed to give him a ride to his cousin's house in Progress Park, an area controlled by the ESP

gang.  While in the car Rangel made a phone call and then told Hernandez to drive to Downey Avenue.  When Rangel saw Sandoval, he said, "Hold on.  I know him.  Stop."  Hernandez pulled over, and Rangel got out of the car.  Suddenly Jesus heard several gunshots.  Seconds later Rangel hopped back in the car just as Hernandez swerved to avoid running over Sandoval, who was lying bleeding in the street.  Jesus did not know Rangel had been armed.  He denied any plans with Rangel to find ESP members and retaliate for the attack on him the previous day.

e.  *The prosecution and defense theories*

The prosecution's theory was that Rangel, Jesus and Hernandez planned the murder and were guilty of first degree premeditated murder either as direct perpetrators or as aiders and abettors.  The prosecutor also argued, even if Hernandez had intended to commit only an aggravated assault or a simple assault or a battery, murder was a natural and probable consequence of the intended target offense.  His jury was told, if it found Hernandez guilty under that theory, the crime was second degree murder.

Hernandez's and Jesus's defense theory was that Rangel had acted on his own in shooting Sandoval.  Neither of them knew Rangel had a gun.  In addition, Hernandez's counsel argued Hernandez could not have reasonably foreseen Rangel's reckless and murderous actions and thus was not guilty under a theory that murder was the natural and probable consequence of the assault or battery offense he had intended to commit.

f.  *The verdict*

The jury found Hernandez guilty of murder.  On the verdict form, which provided, "We find said MURDER to be in the _____ degree (1st or 2nd)," the jury inserted "2nd."  The jury also marked

6

"TRUE" to the allegations the offense had been committed for the benefit of a criminal street gang and a principal personally and intentionally discharged a firearm in committing the offense.

2. *Affirmance of Hernandez's Conviction Based on the Natural and Probable Consequences Doctrine*

We rejected on appeal Hernandez's contention his second degree murder conviction was not supported by substantial evidence, holding, "[T]here was ample evidence that he aided and abetted an aggravated assault and murder was the natural and probable consequence of that target crime:[4]  By his own admission, Hernandez intended to find an ESP gang member and, if talking did not settle the matter, to attack him; he also knew Rangel had a gun, creating the deadly situation that ultimately occurred.  [Citation.]  Indeed, gang fights between rival criminal street gangs that escalate into brawls resulting in homicide are paradigmatic circumstances in which the [Supreme] Court has upheld natural and probable consequences liability."  We then noted, because the jury's second degree murder verdict was supported by substantial evidence that murder was the

---

[4]  In an earlier portion of our opinion rejecting Hernandez's argument the trial court had erred in not instructing on involuntary manslaughter, we held, "Even if Enrique's jury believed his highly unlikely version of events—that he intended at most to aid and abet a simple assault or battery—the evidence was undisputed that Enrique, Jesus and Rangel were hunting for ESP gang members; Enrique knew Rangel had a gun; and he understood Rangel intended to use it and 'take care of things' if the situation got out of hand.  On this record there simply was no material issue whether murder was the natural and probable consequence of the target offense that Enrique intended to aid and abet."

7

natural and probable consequence of the target crime Hernandez intended to commit, "we need not reach the alternative argument that there was insufficient evidence of direct aiding and abetting to support the jury's murder verdict."

3. *Hernandez's Petition for Resentencing*

On January 23, 2019 Hernandez, representing himself, filed a petition for resentencing under section 1170.95 and requested appointment of counsel to represent him during the resentencing process. Hernandez checked boxes on the printed form petition declaring he was eligible for resentencing because he had been convicted of first or second degree murder pursuant to the felony-murder rule or the natural and probable consequences doctrine and could not now be convicted of murder because of the amendments to sections 188 and 189 made by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437), effective January 1, 2019.

The superior court reappointed the attorney who had represented Hernandez at trial to represent him during the section 1170.95 process.[5] After several extensions of time the prosecutor filed an opposition to Hernandez's petition, arguing Senate Bill 1437 and, in particular, section 1170.95 were unconstitutional and, in any event, Hernandez was ineligible for resentencing as a principal in Sandoval's murder. Hernandez through appointed counsel filed a supplemental petition/reply memorandum in support of his petition. Hernandez attached as exhibits to his reply memorandum copies of the briefs filed in his direct appeal, our opinion affirming the judgments of conviction

_____

[5]      As provided in section 1170.95, subdivision (b)(1), Judge Ricardo R. Ocampo, who had presided at Hernandez's trial and sentenced him, conducted the section 1170.95 proceedings.

8

of Hernandez and his two codefendants (modified slightly with respect to the restitution fines imposed) and his unsuccessful petition for review in the Supreme Court.

The court set the matter for a show cause hearing on January 9, 2020. Both the prosecutor and Hernandez stated they would not be introducing new evidence at the hearing, relying on this court's opinion affirming Hernandez's conviction and the trial record.

Following argument of counsel the court denied the petition, finding the People, via the record of conviction, "proved beyond a reasonable doubt that the petitioner personally acted with malice." Explaining its ruling at the conclusion of the hearing, the court emphasized that Jesus had been threatened and assaulted by rival gang members with a gun. Hernandez was aware of that and went to hunt for the ESP gang members who had assaulted his brother or any members of ESP. The gang expert's testimony indicated disrespect is met with retaliation, not conversation. As the court noted, "He knew that Mr. Rangel had a gun. He wouldn't have gone to go hunting without one. It's just logic, common sense."

The court continued, "Petitioner stopped the car, and the shooter got out. There was no attempt by either Jesus, his brother, or the petitioner to get out of the car. If there was an intention to talk to individuals or even fight individuals, they would have both gotten out of the car, but they didn't. The petitioner waited for the shooter to return to the car and fled. Not the actions of one that was surprised by Mr. Rangel's actions."

The court added that Hernandez's subsequent statement, overheard by Mejia, that "someone saw us" was "inclusive." "It

included himself as opposed to distancing himself from an unexpected act by [Rangel]."

The court's minute order mirrored its statement at the hearing: "This court finds that the People via the record of conviction have proved beyond a reasonable doubt that the petitioner personally acted with malice.  The petition to vacate the murder conviction pursuant to [section 1170.95] of the Penal Code is denied."

Hernandez filed a timely notice of appeal.

## DISCUSSION

1. *Senate Bill 1437 and the Section 1170.95 Petition Procedure*

Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 838-839 (*Gentile*)) and significantly limited the felony-murder exception to the malice requirement for murder.  (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 236, review granted Mar. 10, 2021, S266652; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1080.)  Senate Bill 1437 also authorized, through new section 1170.95, an individual convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder because of Senate Bill 1437's changes to the definition of the crime.  (See *Gentile*, at p. 859.)

Once a petitioner makes a prima facie showing he or she is entitled to resentencing, the superior court must issue an order to show cause (§ 1170.95, subd. (c)) and hold a hearing to determine whether to vacate the murder conviction and to resentence the

10

petitioner on any remaining counts.  (§ 1170.95, subd. (d)(1); see *People v. Verdugo* (2020) 44 Cal.App.5th 320, 327, review granted Mar. 18, 2020, S260493.)  At the hearing the prosecution has the burden of proving beyond a reasonable doubt the petitioner is ineligible for resentencing (§ 1170.95, subd. (d)(3))—that is, the People must prove beyond a reasonable doubt every element of liability for murder under the amended statutes.  (See *People v. Rodriguez, supra,* 58 Cal.App.5th at p. 230, review granted; *People v. Lopez* (2020) 56 Cal.App.5th 936, 949, review granted Feb. 10, 2021, S265974; but see *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309 [prosecutor must only prove a reasonable jury could find the defendant guilty of murder with the requisite mental state; "[t]his is essentially identical to the standard of substantial evidence"].)  The prosecutor and petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.  (§ 1170.95, subd. (d)(3); see *People v. Tarkington* (2020) 49 Cal.App.5th 892, 898-899, review granted Aug. 12, 2020, S263219; *People v. Drayton* (2020) 47 Cal.App.5th 965, 981.)

On appeal from the superior court's decision denying a petition for resentencing following an evidentiary hearing, we apply the deferential substantial evidence standard of review to the superior court's factual findings.  (*People v. Rodriguez, supra,* 58 Cal.App.5th at p. 238, review granted; *People v. Lopez, supra,* 56 Cal.App.5th at p. 953, review granted; see *People v. Duke, supra,* 55 Cal.App.5th at p. 120, review granted.)  Under this standard of review our role does not involve a reevaluation of the evidence.  Rather, we presume the existence of every fact the court could reasonably have deduced from the evidence.  (*People*

11

*v. Brooks* (2017) 3 Cal.5th 1, 58; *People v. Sandoval* (2015)
62 Cal.4th 394, 423.)

2. *Substantial Evidence Supports the Superior Court's*
   *Finding Hernandez Acted with Malice in Aiding and*
   *Abetting the Murder of Sandoval*

Section 188, subdivision (a)(3), as amended by Senate
Bill 1437, provides, "Except as stated in subdivision (e) of
Section 189 [the felony-murder rule], in order to be convicted of
murder, a principal in a crime shall act with malice aforethought.
Malice shall not be imputed to a person based solely on his or her
participation in a crime." (See *Gentile*, *supra*, 10 Cal.5th at
p. 846 ["The language of section 188(a)(3) requires a principal to
'act with malice aforethought' in order to be convicted of murder,
making no exception for accomplices or second degree murder.
[Citation.] By its terms, section 188(a)(3) permits a second
degree murder conviction only if the prosecution can prove the
defendant acted with the accompanying mental state of mind of
malice aforethought"].)

Thus, to establish Hernandez was ineligible for
resentencing, the People had to prove beyond a reasonable doubt
he acted as a principal (an aider and abettor) in Sandoval's
murder with express malice (§ 188, subd. (a)(1))—an intent to kill
unlawfully—or implied malice (§ 188, subd. (a)(2))—a dangerous
intentional act, performed with knowledge of the danger to, and
with conscious disregard for, human life. (See *Gentile*, *supra*,
10 Cal.5th at p. 850 ["notwithstanding Senate Bill 1437's
elimination of natural and probable consequences liability for
second degree murder, an aider and abettor who does not
expressly intend to aid a killing can still be convicted of second
degree murder if the person knows that his or her conduct

12

endangers the life of another and acts with conscious disregard for life"]; see generally CALCRIM No. 520 [defining express and implied malice].)

Hernandez argues the trial record does not contain substantial evidence to support the superior court's finding he could still be convicted of murder under a direct aiding and abetting theory. With respect to express malice, he asserts the jury acquitted him of first degree murder, rejecting the prosecutor's express malice argument, and argues that finding cannot be revisited in the section 1170.95 process. As to implied malice, Hernandez contends, contrary to the court's finding, nothing about his conduct—driving the car to look for opposing gang members, stopping the car so Rangel could jump out and driving Rangel from the scene after the shooting—endangered the life of another or indicated his conscious disregard for life. Neither argument has merit.

First, Hernandez reads far too much into the jury's second degree murder verdict. It is true this verdict was consistent with, and supported by, the natural and probable consequences theory advanced by the prosecutor, as we held in affirming the conviction. But the jury might also have found Hernandez guilty of second degree murder as a direct aider and abettor who acted with express malice (an intent to kill), but not premeditation. (See, e.g., *People v. Chun* (2009) 45 Cal.4th 1172, 1181 ["'[s]econd degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder'"].) That this may not have been the People's theory at trial does not preclude the prosecutor from advancing it at the order to show cause hearing

13

to prove Hernandez's ineligibility for resentencing. (See *People v. Lopez, supra*, 56 Cal.App.5th at pp. 941-942, 955-958, review granted [petitioner convicted of second degree murder under a natural and probable consequences theory properly denied resentencing under section 1170.95 based on proof he could be convicted of murder on an implied malice theory].) Indeed, it is a fundamental premise of Senate Bill 1437 that an individual convicted of murder under the natural and probable consequences doctrine must be resentenced only if the People cannot prove he or she would still be liable for murder under a different theory based on the record of conviction or new or additional evidence.[6]

_____

[6] That the separate jury hearing somewhat different evidence, which included Rangel's police interview, convicted Rangel and Jesus of first degree murder does not support Hernandez's argument that his jury must have rejected express malice as a basis for finding him guilty of second degree murder. (See *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 917 ["[A]n actual killer and an aider/abettor are not always guilty of the same offense. Rather, in a homicide prosecution not involving felony murder or the natural and probable consequences doctrine, the aider/abettor's guilt is based on the combined acts of all the principals and on the aider/abettor's own knowledge and intent. Consequently, in some circumstances an aider/abettor may be culpable for a greater or lesser crime than the actual killer"]; cf. *People v. Superior Court* (*Sparks*) (2010) 48 Cal.4th 1, 13 ["'[T]he rule of consistency is a vestige of the past with no continuing validity. Many reasons may explain apparently inconsistent verdicts: lenience, compromise, differing evidence as to different defendants, or, possibly, that two juries simply viewed similar evidence differently. If substantial evidence supports a jury verdict as to one defendant, that verdict

There is ample evidence of Hernandez's intent to kill as he facilitated the murder of Sandoval. As the superior court summarized, Hernandez, knowing his younger brother had been assaulted by armed rival gang members, went hunting for members of that gang intending, in his own words, to show support for his brother. The superior court was entitled to disbelieve Hernandez's claim he only intended to talk to the rival gangsters or perhaps engage in a fistfight, an assertion belied by his knowledge that the gangsters who had attacked Jesus were armed and that Rangel had a weapon, his failure to try to approach Sandoval after the car stopped and Rangel got out, and the gang expert's testimony regarding the nature of retaliation expected within gang culture.

This evidence also supports the finding Hernandez acted with implied malice. Even if Hernandez did not actually intend for anyone to be killed, hunting for a rival gang member to retaliate for that gang's assault on Jesus, knowing that Rangel was armed, and then stopping to allow Rangel to attack Sandoval were unquestionably actions that endangered Sandoval's life. It was reasonable for the court to infer that Hernandez knew his actions created that danger and nevertheless acted with conscious disregard for the life of their targeted victim. (See *Gentile*, *supra*, 10 Cal.5th at p. 850; *People v. Lopez*, *supra*, 56 Cal.App.5th at p. 956, review granted.)

---

may stand despite an apparently inconsistent verdict as to another defendant'"].)

## DISPOSITION

The postjudgment order denying Hernandez's petition for resentencing is affirmed.


                                PERLUSS, P. J.

We concur:



SEGAL, J.



FEUER, J.