[Civ. No. 17051. Third Dist. Sept. 12, 1979.]

COUNTY OF SACRAMENTO et al., Plaintiffs and Respondents, v.
JEROME A. LACKNER, as Director, etc., et al.,
Defendants and Appellants;
COUNTY OF SAN MATEO, Intervener and Respondent.

**580**

## COUNSEL

Evelle J. Younger and George Deukmejian, Attorneys General, John J. Klee, Jr., Assistant Attorney General, Thomas E. Warriner, Elisabeth C. Brandt, Asher Rubin and John Fourt, Deputy Attorneys General, for Defendants and Appellants.

L. B. Elam, County Counsel, Warren E. Thornton, Acting County Counsel, and J. Steven Burris, Deputy County Counsel, Richard J. Moore, County Counsel, and Kelvin H. Booty, Jr., Senior Deputy County Counsel, for Plaintiffs and Respondents.

Keith C. Sorenson, District Attorney, and James A. Aiello, Assistant District Attorney, for Intervener and Respondent.

## OPINION

**EVANS, J.**—This appeal presents a controversy over Medi-Cal payments which plaintiff counties allege are due them from the defendants. Defendants appeal from a judgment granting the County of Sacramento, County of Alameda, and intervener County of San Mateo (unless otherwise specified, referred to as plaintiffs) declaratory relief and a peremptory writ of mandate. The judgment found that certain Medi-Cal payments made were insufficient in amount and directed reimbursement to the counties and declaratory relief.

In 1965, California adopted the Medi-Cal program (Welf. & Inst. Code, § 14000 et seq.)[1] for the purpose of extending individualized medical treatment to those traditionally unable to afford such services. To

---

[1]Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code, and to those provisions pertinent at the time to the present controversy. Some sections (14150.1 to 14150.5 and 14153 to 14156) were repealed; others have been amended since this action arose.

achieve that result the program, in conjunction with a federal program (42 U.S.C. § 1396 et seq.), provided for reimbursement to both public and private health care providers for medical services rendered.

When enacted, the Medi-Cal program established two plans for reimbursing counties providing health care services to indigents. Under the "standard" county plan (§ 14150), a county was required to pay the state a specific sum, in return for which the state would pay for the medical care of all individuals falling within certain welfare eligibility categories (hereinafter referred to as linked individuals). Financial responsibility for nonlinked individuals, i.e., those who did not fall within the welfare eligibility classification, remained with the counties.

The second alternative, known as the "option plan" (§ 14150.1) provided that annually a county would be required to pay the state a sum equal to 100 percent of the county's health care costs (which included both linked and nonlinked individuals) provided in the 1964-1965 fiscal year, with an adjustment for population increase; in return the state would pay the county's entire cost of medical care. The election to enter the "option" program was made irrevocable until June 30, 1970. (§ 14150.1.) The plaintiffs chose the option plan.

After its enactment the cost of implementing the Medi-Cal program escalated rapidly; in 1967, in order to limit these increases, the Legislature enacted section 14150.2[2] which imposed strict limits on future cost increases for counties under the option plan and established a $44 million ceiling on funds available for the care of nonlinked individuals in option counties.

Despite that legislation, state Medi-Cal costs again escalated to unacceptable levels. In December 1970, the Director of the then Department of Health Care Services declared a fiscal emergency and imposed a 10 percent cutback in payments to health care providers and adopted regulations causing a postponement of certain elective services under Medi-Cal. (See *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637 [106 Cal.Rptr. 555].)

---

[2]Section 14150.2, subdivision (c), provides: "Notwithstanding any other provision of this code, the state's obligation to pay to counties which have elected to come within the provisions of Section 14150.1 the amounts of costs incurred in the 1967-68 fiscal year for persons in county or contract hospitals who are neither categorical aid recipients nor medically indigent persons as specified in Section 14150 which are in excess of such costs for the 1964-65 fiscal year shall not exceed forty-four million dollars ($44,000,000) during the 1967-68 fiscal year, and in subsequent fiscal years shall not exceed the amount appropriated by the Legislature in the Budget Act for that purpose."

Against this historical background, in 1971 plaintiffs (who are option counties) filed the instant mandate action. While the exact nature of the pleadings is in question, the main thrust of the suit sought to enjoin defendants from implementing the so-called emergency regulations. Plaintiffs' action was consolidated for trial with a similar action, *California Medical Assn.* v. *Brian, supra.* The trial court, in the consolidated proceeding, found the emergency regulations invalid, issued findings and conclusions, and awarded judgment to plaintiffs.

The defendants in *California Medical Assn.* v. *Brian* separately appealed the action. We affirmed the judgment. (*California Medical Assn., supra,* 30 Cal.App.3d 637.) A purported appeal by defendants in this case was ordered dismissed under the one final judgment rule (Code Civ. Proc., § 904.1), as the issue of damages remained unresolved.

The matter then went to trial in this proceeding on the question of the extent of "damages." The court awarded the County of Sacramento $1,556,305.20, County of Alameda $3,120,695.63, and the County of San Mateo $1,184,445, with interest, in each case, from June 1971.

On appeal, defendants do not contest the trial court's conclusion that the 10 percent cutback and the December 15 regulations were invalid, but rather limit their attack to the issue of whether the damages awarded plaintiffs were, in whole or part, proper. To this end defendants present five major contentions.

I

■ Defendants first contend the amounts awarded each plaintiff for costs of health care exceeded the amount each county was entitled to receive pursuant to sections 14150.1 and 14155. Defendants assert that if plaintiffs were entitled to recovery at all, they could recover only the increased cost of medical services occasioned by the 10 percent cutback and the emergency regulations. The contention is without merit.

We have reviewed the pleadings and all amendments presented by the three plaintiffs and agree with defendants that the issue of total reimbursement under sections 14150.1 and 14155 was not specifically raised. However, the petitions in each case request any relief the court deems appropriate, and contrary to defendants' argument plaintiffs did during trial declare their intention to seek damages for the state's failure to reimburse as required by sections 14150.1 and 14155, irrespective of

the December 15 regulations and 10 percent cutback. The following colloquy during the proceedings make this point clear:

"MR. HEINRICH [Counsel for plaintiff, Sacramento County]: Q. Now, as far as the option is concerned, the funded option, Mr. Cumming, how much did the State fund the option for throughout the state?

"A. The State provided in this year's budget $35,000,000 in State funds to go with approximately $111,000,000 in county funds to pay for care of this third group of patients which we are calling option patients.

"Q. And how much was allocated to the County of Sacramento?

"A. $35,353,000 was allocated to Sacramento County.

"THE COURT: Of the thirty-five million?

"THE WITNESS: Yes.

"MR. HEINRICH: Q. And have you made any projection as to how much you may or may not spend in excess of this amount, the county?

"A. Our estimate is that we will exceed that by at least $800,000 because there wasn't a big enough appropriation made. The thirty-five million simply won't cover our needs and the needs of the other option counties.

"Q. This will have to be paid by the County of Sacramento itself?

"A. That's correct.

"Q. I see.

"THE COURT: But you are not suing for that, huh?

"THE WITNESS: Ask him.

"MR. HEINRICH: No, no. *We are. We are.*

"THE COURT: All right." (Italics added.)

Moreover, we do not agree with defendants' argument that the damages awarded were outside the scope of the court's findings of fact and conclusions of law. Findings of fact numbers 41 through 45 provide as follows:

"41. That the Counties of Sacramento, Alameda and San Mateo are, and at all times herein mentioned have been, 'option' counties, having elected to become so under Section 14150.1 of the Welfare and Institutions Code and have incurred and are incurring costs greater than

the maximum net cost which has been guaranteed to the counties by Sections 14150.1 and 14155 of the Welfare and Institutions Code.

"42. That Sections 14150.1 and 14155 manifest a legislative intent to guarantee to option counties that their net costs for providing health care services to categorical aid recipients and all other persons in the county hospital shall not exceed the actual county costs for such services rendered in the 1964-65 period plus proportionate increases for population growth.

"43. That the effect of the regulations adopted December 11, 1970, pursuant to Section 14120(c) upon plaintiff counties is to increase their costs of providing health care services to an amount greater than the maximum net cost guaranteed by Sections 14150.1 and 14155.

"44. That in addition to the regulations adopted December 11, 1970, the Director ordered a 10% reduction in payments pursuant to Section 14120(c), the effect of which was to increase the costs to plaintiff counties of providing health care services to an amount greater than the maximum net cost guaranteed by Sections 14150.1 and 14155.

"45. That a controversy has arisen and now exists between plaintiff counties and defendants with respect to whether Sections 14150.1 and 14155 of the Welfare and Institutions Code constitutes a guarantee to option counties that their costs for providing health care services to categorical aid recipients and all other persons in the county hospital is not to exceed the total county costs for such services rendered in the 1964-65 period plus proportionate increases for population growth.

"46. That plaintiff counties desire a judicial declaration as to whether Sections 14150.1 and 14155 constitute a guarantee to option counties as set out above."

Based upon these findings the court concluded:

"22. Welfare and Institutions Code §§ 14150.1 and 14155 guarantee that the maximum net costs to an option county for providing health care services to categorical aid recipients and all other persons in the county hospital are limited to the actual county costs for health care services for the 1964-65 fiscal year plus proportionate increases based upon population growth.

"23. That under the guarantee set out above and contained in Sections 14150.1 and 14155, the 10% reduction in payments and the regulations adopted pursuant to Section 14120(c) of the Welfare and Institutions Code may not be applied to hospitals operated by option counties.

"24. *That plaintiff counties are entitled to be reimbursed for the cost of their services in excess of the maximum cost guaranteed by Sections 14150.1 and 14155.*

"25. That the Court declares that Sections 14150.1 and 14155 of the Welfare and Institutions Code guarantees that the maximum net costs to an option county for providing health care services to categorical aid recipients and all other persons in the county hospital are limited to the actual county costs for health care services for the 1964-65 fiscal year plus proportionate increases based upon population growth." (Italics added.)

By reason of the foregoing, the question of the court's *jurisdiction* to consider and order total reimbursement may not be seriously challenged. (See *Estrin* v. *Superior Court* (1939) 14 Cal.2d 670, 678 [96 P.2d 340]; *Perego* v. *Seltzer* (1968) 260 Cal.App.2d 825, 829 [67 Cal.Rptr. 636]; 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 185, pp. 714-715.) While the lack of precise pleadings raises the nonjurisdictional issue of variance, the record referred to affirmatively establishes that the question of whether sections 14150.1 and 14155 guaranteed reimbursement was raised and that plaintiffs specifically declared their quest for these "expanded" damages. Under the circumstances we find only an immaterial minor variance. (*Hayes* v. *Richfield Oil Corp.* (1952) 38 Cal.2d 375, 382 [240 P.2d 580]; *McAllister* v. *Union Indemnity Co.* (1935) 2 Cal.2d 457, 459-460 [32 P.2d 650, 42 P.2d 305]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 1061, pp. 2637-2638.)

II

Defendants argue that assuming sections 14150.1 and 14155 guarantee option counties a ceiling cost for indigents' medical care, the court nevertheless erroneously awarded plaintiffs payment on claims for services to "nonlinked" persons which were improper payments under the Medi-Cal program. Again, we fail to find merit in the contention.

Prior to its repeal in 1971, section 14150.1 provided in pertinent part: "[A] county may elect to pay as its share [of health care costs] one hundred percent (100%) of the county cost of health care uncompensated

from any source in 1964-65 for all categorical aid recipients, and all other persons in the county hospital . . . increased . . . for each fiscal year subsequent to 1964-65 by an amount proportionate to the increase in population . . . . If the county so elects, the county costs of health care in any fiscal year shall not exceed the total county costs of health care uncompensated from any source in 1964-65 for all categorical aid recipients, and all other persons in the county hospital . . . increased . . . by an amount proportionate to the increase in population . . . ."

By that statute the state agreed to assume all county health care costs for those counties electing to come under the option plan in excess of county costs incurred during the 1964-1965 fiscal year, adjusted for population increases. The statute made no distinction between "linked" and "nonlinked" persons, nor did it exclude reimbursement for linked persons who were denied Medi-Cal coverage due to improper billing. The statute simply guaranteed a medical cost ceiling to counties electing to come within the option plan.

Interestingly enough, at trial defendants agreed with this analysis. They wrote: "[a]n increase in the cost of care in county hospitals was anticipated when the Medi-Cal program was proposed in 1965. To protect the counties, amendments to the basic Medi-Cal proposal were made which would allow a county the option to receive a guarantee from the state that its future medical cost would not exceed that of its 1964-65 fiscal year, adjusted upward for population increases. County cost of care exceeding the adjusted level was to be met by the General Fund for those counties electing this optional method of cost sharing."

However, on appeal, defendants argue that the foregoing analysis has the absurd effect of allowing the counties to raid the state treasury at will, without regard to Medi-Cal regulations. We must assume that when it enacted section 14150.1, the Legislature was aware that option county costs not compensable under Medi-Cal (for whatever reason) would fall upon the state. Had the state desired to protect itself from such expense, it could have easily done so in the first instance.

### III

Defendants next contend the trial court was without power to award *any* damages in this, a mandate-declaratory relief action. They argue the absence of compliance with the claims procedures of Welfare

and Institutions Code section 14104.5[3] and Government Code section 900 et seq.[4] precludes any award of damages. The argument is not persuasive.

We note that the question of plaintiffs' lack of compliance with the provisions of section 14104.5 or Government Code section 900 et seq. was not raised prior to this appeal—it was not raised by defendants' pleading, or argued in their trial brief on the issue of liability, or in a proposed amended answer requested by the court and submitted after the court had issued findings of fact and conclusions of law on the issue of liability. Defendants' failure to raise the issue in a timely fashion would generally preclude consideration for the first time on appeal.

Assuming arguendo the issue had been properly raised, it would nevertheless be meritless.

■ An action in traditional mandamus, which seeks an order compelling an official to perform a mandatory duty, is not an action against the state for money, even though the result compels the public official to release money wrongfully detained. (*Forde* v. *Cory* (1977) 66 Cal.App.3d 434, 438 [135 Cal.Rptr. 903]; see *County of Los Angeles* v. *Riley* (1942) 20 Cal.2d 652, 662 [128 P.2d 537]; *County of Mendocino* v. *State of California* (1971) 22 Cal.App.3d 90, 95-96 [98 Cal.Rptr. 904]; *County of L.A.* v. *State Dept. Pub. Health* (1958) 158 Cal.App.2d 425, 442-443 [322 P.2d 968].)

---

[3]Welfare and Institutions Code section 14104.5 provides: "Notwithstanding any other provision of law, the director shall by regulation adopt such procedures as are necessary for the review of a grievance or complaint concerning the processing or payment of money alleged by a provider of services to be payable by reason of any of the provisions of this chapter. After complying with such procedures if the provider is not satisfied with the director's decision on his claim, he may not later than one year after receiving notice of such decision, present a claim for money against the state in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of Division 3.6 of the Government Code and proceed in the manner provided in Part 3 (commencing with Section 900), Part 4 (commencing with Section 940) and Part 5 (commencing with Section 965) of Division 3.6 of the Government Code. The provisions of this section shall be the exclusive remedy available to the provider of services for moneys alleged to be payable by reason of the provisions of this chapter."

[4]Defendants rely upon that portion of Government Code section 905.2 which provides: "There shall be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of this part all claims for money or damages against the state:

" . . . . . . . . . . . . . . . . . . . .

"(b) For which the appropriation made or fund designated is exhausted.

"(c) For money or damages (1) on express contract, or (2) for an injury for which the state is liable. . . ."

In *County of L.A.* v. *State Dept. Pub. Health, supra,* 158 Cal.App.2d at pages 442-443, an action in declaratory relief and mandamus, the trial court ruled that state subsidy payments under the Tuberculosis Subsidy Law had been improperly withheld from Los Angeles County and ordered the state to release the funds. (*Id.,* at p. 430.) Upholding this action against the state's contention that it was immune from suit as a sovereign, the appellate court wrote: "[T]he object of the present suits is to compel state officers to disburse funds specifically appropriated for tuberculosis subsidies in the manner provided by the statute. This involves no invasion of state sovereignty and does not fall within the rule precluding suits against the state without its consent." (*Id.,* at p. 443.)

■ Similarly, in the case before us plaintiffs sought to compel the state to disburse funds in the manner provided by the Medi-Cal statutes. While the action has the practical effect of awarding plaintiffs money (which has routinely been referred to as "damages" by all parties), in law it is simply an action in mandamus to compel by ministerial act the release of funds, not one for damages from the sovereign. Accordingly, plaintiffs were not required to pursue claims pursuant to either section 14104.5 or Government Code section 905.2.

Defendants' reliance upon *Rios* v. *Cozens* (1972) 7 Cal.3d 792, 800 [103 Cal.Rptr. 299, 499 P.2d 979] (vacated 410 U.S. 425 [35 L.Ed.2d 398, 93 S.Ct. 1019], reinstated 9 Cal.3d 454 [107 Cal.Rptr. 784, 509 P.2d 696]), and *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 246 [115 Cal.Rptr. 497, 524 P.2d 1281], is misplaced, each is factually distinguishable and requires no further discussion.

## IV

■ We deal next with defendants' contention that the enactment of section 14150.2, subdivision (c), and the exhaustion of the funds subsequently allocated precludes the trial court from awarding damages.

Again, despite defendants' assertions to the contrary, the effect, if any, of section 14150.2, subdivision (c), was not raised in a timely fashion. The record indicates that defendants initially answered plaintiffs' petition for mandate and declaratory relief and raised as their only affirmative defense plaintiffs' failure to comply with Government Code section 11426.[5]

---

[5]Government Code section 11426 provided: "Except where the right to petition for adoption of a regulation is restricted by statute to a designated group or where the form

Defendants fail to direct our attention to any record reference which will support their claim that the theory was properly before the trial court. Accordingly, the issue was not preserved for appellate review. However, the issue is a clear and unclouded matter of legislative enactment, and in order to achieve justice for all parties we nonetheless exercise our inherent powers and consider the issue.

As previously noted, when enacted, Medi-Cal provided for two alternative means of county reimbursement. Under the "option" alternative, counties were guaranteed that ". . . costs of health care [including linked and nonlinked individuals] in any fiscal year shall not exceed the total county costs of health care uncompensated from any source in 1964-1965 [plus adjustments] . . . ." (§ 14150.1.) The election to participate in this method of reimbursement was specifically made irrevocable until June 30, 1970. (§ 14150.1.)

Despite this guarantee of a cost ceiling, and faced with escalating Medi-Cal costs, the Legislature in 1967 imposed strict guidelines on reimbursing counties electing to come under the "option" plan. (§ 14150.2.) Pursuant to subdivision (c) of section 14150.2, the state imposed a limit on its obligation to pay for medical services to nonlinked persons served by a county within the "option" plan. As budgeted in the 1970-1971 fiscal year, this liability limitation was $35 million. (Budget Act of 1970, Stats. 1970, ch. 303, § 2, item 272(c).) From this budgeted amount each plaintiff county was given a proportionate share but failed to achieve full reimbursement to the extent initially provided for by section 14150.1.

■ "[I]t is the general rule that one legislature cannot enact irrepealable legislation or limit or restrict its own power or the power of its successors as to the repeal of statutes, and an act of one legislature is not binding upon, and does not tie the hands of future legislatures. [Citation.] In Lewis' Sutherland Statutory Construction, vol. 1, sec. 244, pages 456, 457, the rule is thus stated:

" 'Every legislative body may modify or abolish the acts passed by itself or its predecessors. This power of repeal may be exercised at the

---

of procedure for such a petition is otherwise prescribed by statute, any interested person may petition a state agency requesting the adoption or repeal of a regulation as provided in this article. Such petition shall state clearly and concisely:
"(a) The substance or nature of the regulation, amendment, or repeal requested;
"(b) The reasons for the request;
"(c) Reference to the authority of the state agency to take the action requested."

same session at which the original act was passed; and even while a bill is in its progress and before it becomes a law. The legislature cannot bind a future legislature to a particular mode of repeal. It cannot declare in advance the intent of subsequent legislatures or the effect of subsequent legislation upon existing statutes.' " (*United Milk Producers* v. *Cecil* (1941) 47 Cal.App.2d 758, 764-765 [118 P.2d 830].)

 The enactment of section 14150.2, subdivision (c), in 1967 changed the extent of state liability for services to nonlinked individuals by option counties from unlimited to a maximum of the amount appropriated by the state in any fiscal year for that purpose. That this was a valid exercise of the legislative authority cannot be questioned.

In opposition, the plaintiffs first contend the effect of the 1967 legislation is directly contrary to the purpose of sections 14150.1 and 14155 as originally enacted. We agree—nothing could be more clear. However, this observation does not detract from the Legislature's ability to enact the subsequent legislation as statutes are routinely modified or repealed.

Plaintiffs also argue that the decision to enter the option program was made irrevocable until June 1970, and assert that the state should not be allowed to reduce its share of Medi-Cal cost while the option counties were "locked" into the payment program. This argument is quite appealing as it applies to years prior to the 1970-1971 fiscal year. However, during the latter fiscal year (the year here in question), the counties were free to remove themselves from the option program. (§ 14150.1.) Despite its appealing force, the argument is not applicable to the issues presented.

Plaintiffs also rely upon *County of Alameda* v. *Lowry* (1975) 45 Cal.App.3d 736 [119 Cal.Rptr. 725], and *County of L.A.* v. *State Dept. of Pub. Health, supra,* 158 Cal.App.2d 425, which they assert establish their right to continued reimbursements under sections 14150.1 and 14155 without regard to section 14150.2, subdivision (c). Those cases established contractual obligations between the parties; as such they are inapplicable in a situation where, as here, the complaint seeks mandate to compel a state official to perform his official duties. Both cases dealt with a conflict between *regulations* and not a conflict between succeeding statutes.

The contention thus has merit to the extent that the amount of the award must be reconsidered. Defendants have not attempted to identify

which of the claims of damages would be affected. The matter must therefore be remanded for further determination of the amount of damages in light of the views expressed herein.

V

Defendants finally contend the court had no power to order the funds owing plaintiffs under the judgment be offset against their current liabilities under the Medi-Cal program. The contention is without merit.

On appeal the judgment of the lower court is presumed cloaked with a mantle of validity. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 235, pp. 4225-4226.) In a challenge to a judgment, it is incumbent upon an appellant to present argument and authority on each point made. Arguments not presented will generally not receive consideration. (See 6 Witkin, Cal. Procedure, *supra,* Appeal, § 425, pp. 4391-4393.)

Defendants have set forth two arguments attacking the court's order of offset. First, they allege the court is denied authority to offset by Government Code section 955.5.[6] However, that section by its terms is applicable only to tort claims liability. As we have previously pointed out, plaintiffs sought a *writ of mandate* and *declaratory relief* based upon defendants' failure to carry out their statutory duties. Government Code section 955.5 is inapplicable.

Secondly, defendants argue the offset violates the provisions of article IV, section 12, subdivision (e), of the state Constitution. Specifically, defendants submit the order has the practical effect of forcing legislation in order to increase the amounts appropriated for Medi-Cal to cover the decrease in incoming funds occasioned by the offset. This contention is unpersuasive.

---

[6]Government Code section 955.5 provides: "Notwithstanding any other provision of law, including Section 942 of this code, neither the state, nor any of its officers or employees, can be required by any court in any proceeding to pay or offset a tort liability claim, settlement or judgment for which the state is liable unless the Legislature has authorized the payment or offset of a specific tort liability claim, settlement or judgment, or the Director of Finance has certified that a sufficient appropriation for such payment or to provide for the offset exists. No money or property belonging to, in the custody of, or owing to the state or any state agency is subject to garnishment, execution, or attachment or any other proceeding for enforcing any such claim, settlement or judgment."

Article IV, section 12, subdivision (e), of the California Constitution provides: "The Legislature may control the submission, approval, and enforcement of budgets and the filing of claims for all State agencies." Assuming, arguendo, that the order of offset does make necessary additional legislative appropriations, it may not be concluded as a consequence that the order interferes with the Legislature's control over the "submission, approval, and enforcement of budgets . . . ."

The judgment is reversed on the question of the amount of damages. The matter is remanded with directions that the trial court recompute the amount of damages for medical services extended to nonlinked individuals during the 1970-1971 fiscal year, not to exceed plaintiffs' proportionate share of revenues under section 14150.2, subdivision (c). In all other respects, the judgment is affirmed.

Janes, Acting P. J., and Paras, J., concurred.