Filed 10/29/24  P. v. Sussman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081163 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD284910) |
| NANCY SUSSMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David L. Berry, Judge.  Affirmed.

Heather E. Shallenberger and Cliff Dean Schneider, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel, Stephanie H. Chow, and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Nancy Sussman appeals from her criminal threat conviction, (Pen. Code,[1] § 422), contending insufficient evidence supported the charge, and the trial court erred by not instructing the jury on an attempted criminal threat as a lesser included offense. She additionally argues the trial court erred in denying her posttrial motion to unseal juror identifying information so she could investigate potential juror misconduct. We disagree with her assertions and affirm the conviction.[2]

# II. FACTUAL AND PROCEDURAL BACKGROUND

In 2011 or 2012, Sussman, along with her son and daughter, moved to a house on Lomond Drive in San Diego, across the street from Alfonso Martinez and his wife. The homes are about 30 feet apart. Martinez's house has an eight-camera surveillance system.

Within two months of the move, friction developed between the new neighbors, with Martinez complaining to Sussman about her son's behavior. Over time, the conflict between them escalated.

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    Sussman moved to augment the record with documents taken from San Diego Superior Court case No. SCD283989. The court dismissed that matter for failure by the People to file timely the information. The criminal case underlying this appeal, San Diego Superior Court case No. SCD284910, is a refile of case No. SCD283989. The requested documents are not relevant to Sussman's assertions of error. Therefore, we deny the motion to either augment the record with the identified materials or take judicial notice of them.

In 2013, Martinez believed Sussman's son ordered his friend to slash Martinez's car's tires, so he sought a civil restraining order against Sussman and her son. The court granted Martinez's request against Sussman's son, but not against Sussman.

During the next three years, Martinez called the police when he perceived Sussman's son violated the restraining order. As a result, Sussman believed Martinez did everything he could to get her and her son in trouble, and she contemplated moving.

In December 2016, during a physical fight between Martinez and Sussman's son Sussman asked the police to arrest Martinez, but they did not. Due to this fight, Sussman tried to buy a gun but was only allowed to obtain a gun permit. While at the gun shop, Sussman made statements which three police officers in the shop overheard and interpreted as threatening to Martinez. The police notified Martinez, who sought and obtained a three-year civil restraining order against Sussman, which the court granted in February 2017.

In December 2018, while Sussman and her children were in Borrego Springs, Sussman found her son dead. The cause of death was accidental,[3] but Sussman believed Martinez was indirectly involved. The loss of her son caused Sussman to develop severe posttraumatic stress disorder. Martinez knew Sussman was devastated about her son's death.

In July 2019, Martinez's surveillance video caught Sussman placing caterpillars on Martinez's truck. Within days of this incident, Sussman gave

---

[3]    At a sentencing hearing in October 2022, when Sussman was represented by counsel, her attorney told the court that Sussman's son died of a drug overdose.

Martinez the middle finger. Martinez reported both violations of the 2017 restraining order to the police.

On October 28, 2019, at approximately 7:50 a.m., Martinez escorted his wife to her car, as was typical due to Sussman's behavior. That morning, Sussman stood at the end of her driveway and said, " 'Good morning, assholes.' " Martinez's wife saw Sussman give her the middle finger as she drove away.

After Martinez's wife left, Martinez told Sussman: " 'You're violating the restraining order again. I'm going to call the police.' " Sussman responded: " 'Fuck you. Fuck you. You are the reason that my son is dead.' " Martinez replied with something to the effect of, " 'No.' . . . '[Y]ou are the reason that your son is dead. He was your son, and it was your responsibility.' " Martinez further stated, "[Y]ou're the one that . . . gave him money to buy drugs." Sussman then told Martinez, " 'That's okay because all of you are going to die.' " He responded, " 'I'm going to call the police and tell them you are violating the restraining order and you are threatening us over here.' " Sussman began walking across the street toward Martinez. She appeared very angry and upset. She said: " 'I'm going to kill you, your wife, and your kids.' "[4] Sussman flung liquid from a cup in her hand at Martinez, but it did not hit him. Martinez told Sussman: " 'I'm going to call the cops. You're going to go to jail.' " Martinez returned to his home and did not further engage with Sussman.

When Martinez left his home around 8:15 a.m., he noticed feces on the windshield of his truck. He checked his surveillance footage, which showed

---

[4]     At the preliminary hearing Martinez stated that Sussman told him, " 'you're going to die, your wife is going to die, and your kids are going to die.' "

4

Sussman placing the feces on his windshield. He removed the feces with a pooper-scooper. He left the pooper-scooper in front of his house because he planned to call the police later and he wanted it as evidence. He drove to a medical appointment.

When he returned home, Martinez watched surveillance footage captured by his security cameras. Martinez saw that at approximately 9:55 a.m., Sussman approached the gate leading to Martinez's backyard, but it was locked. One minute later, Sussman checked to see if Martinez's garage door and front door would open. They were locked. Undeterred, Sussman replaced small lights, inside pumpkin decorations on Martinez's front porch, with the feces she had earlier placed on the truck's windshield.

The surveillance footage also revealed Sussman returned to Martinez's property at approximately 11:07 a.m. She walked towards Martinez's front door. Then, she walked behind Martinez's shed, where there was a wire to one of Martinez's surveillance cameras. Around that time, that camera stopped recording. Sussman emerged from behind the shed carrying a large knife. Martinez later observed a cut wire on the camera. As Sussman left Martinez's property, she moved the knife from behind her back to under her blouse. Instead of crossing the street as she normally did, she walked along the sidewalk on Martinez's side of the street before returning home.

Based on what he observed, Martinez called the police department's nonemergency number to file a report against Sussman for violating the restraining order and threatening him and his family. When a police officer arrived at Martinez's home, Martinez informed the officer about Sussman's threats. The officer observed the feces, the cut wire behind the shed, and the surveillance footage. The officer arrested Sussman.

5

About two months later, Martinez and his wife moved because the incident scared them. They felt they had done everything they could to protect themselves, but nothing was working. They returned two years later because the property is their family home, and they felt sufficient time had passed for the conflict with Sussman to diffuse.

A complaint filed in January 2020 charged Sussman with making a criminal threat, (§ 422; count 1); stalking with court order in effect, (§ 646.9, subd. (b); count 2); attempted burglary, (§§ 459, 664; count 3); vandalism, (§ 594, subd. (a)(b)(2)(A); count 4); and disobeying a court order, (§ 166, subd. (a)(4); count 5). The attempted burglary count was dismissed after the preliminary hearing.

At trial, the court admitted into evidence the surveillance footage from October 28, 2019. Martinez testified that Sussman's threat "[a]bsolutely" placed him in fear. He explained: "I know Ms. Sussman. I know she's capable of this. And more than myself, it was for my family: my wife and my kids." He also explained he did not call the police immediately after his encounter with Sussman on October 28 because he had a doctor's appointment. In between the time Sussman threatened him and him going to his physician, Sussman had only thrown liquid at him and placed feces on his truck. He did not know about her other behavior. Further, the police had advised him to call the nonemergency number unless there was an emergency in the moment.

When Sussman took the stand, she denied she committed the crimes. She claimed not to know the 2017 restraining order was still in effect on October 28, 2019. She testified Martinez came to her house and said to her: " 'Is [your son] dead, Nancy? Oh, he's going to burn in hell. Did he get boogered up the ass?' " Sussman stated Martinez then said things about her

6

"that were totally inappropriate."  She went inside her home and cried.
Martinez's comments "really upset" her.  It took a while for her to stop
shaking and to get on with her day.  The next thing she remembered was the
police arresting her.  She claimed not to remember anything else that
transpired that day.  She admitted to having memory problems due to her
posttraumatic stress disorder.  She denied committing the activity caught on
surveillance video but acknowledged the figure in the video clips looked like
her.  She believed Martinez staged and doctored the video clips.

　　　The jury found Sussman guilty on all four counts.  Sussman timely
appealed.

## III. DISCUSSION

A.　　*Sufficient Evidence Supports the Criminal Threat Conviction*

　　1.　　*Standard of Review*

　　When a defendant challenges the sufficiency of the evidence supporting
a conviction, " ' "we review the entire record in the light most favorable to the
judgment to determine whether it contains substantial evidence—that is,
evidence that is reasonable, credible, and of solid value—from which a
reasonable trier of fact could find the defendant guilty beyond a reasonable
doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th
719, 780.)  We presume " ' "in support of the judgment the existence of every
fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*)
"Reversal on this ground is unwarranted unless it appears 'that upon no
hypothesis whatever is there sufficient substantial evidence to support [the
conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

2. *Section 422: Criminal Threat*

A section 422 charge has five elements: "(1) [ ] the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) [ ] the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) [ ] the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) [ ] the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) [ ] the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*).) Sussman contends insufficient evidence supports a conviction for criminal threats because her alleged threat lacked the requisite immediacy (element three, above), and did not actually place Martinez in sustained fear (element four, above).[5] We disagree.

---

[5]     Sussman also contends, for the first time in her reply brief, that the criminal threat verdict violates her due process rights under the federal Constitution because the conviction was based on insufficient evidence of every element of the offense. This contention is belated and unaccompanied by a showing of good cause for the delay. It is therefore forfeited. (*People v. Failla* (2006) 140 Cal.App.4th 1514, 1519, fn. 3.) Even if it were not forfeited, the contention lacks merit. As we explain, substantial evidence supports Sussman's criminal threat conviction.

3. *Sussman's Threat Was Unequivocal, Unconditional, Immediate, and Specific*

Section 422 targets " 'a specific and narrow class of communication,' and 'the expression of an intent to inflict serious evil upon another person.' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805 (*Wilson*).) The statute was not enacted to punish emotional outbursts, angry utterances, or ranting soliloquies, however violent. (*Ibid.*) " 'A threat is sufficiently specific [to support a criminal threat conviction] where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed." ' " (*Id.* at p. 806.)

" '[U]nequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' " (*Bolin, supra,* 18 Cal.4th at p. 340.) "Thus, the third element's four enumerated statutory elements—unequivocality, unconditionality, immediacy and specificity—are " 'simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." ' " (*Wilson, supra,* 186 Cal.App.4th at p. 807.) These circumstances include the parties' history, the defendant's mannerisms, affect, and actions involved in making the threat, and the defendant's subsequent actions. (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1013–1014 (*Solis*).)

Sussman argues her purported threat was nothing more than an angry utterance and emotional outburst, a response to Martinez's insensitive comments about her son. However, Sussman told Martinez, " '[A]ll of you are going to die.' " She also said, either " 'I'm going to kill you, your wife, and

9

your kids,' " or " 'you're going to die, your wife is going to die, and your kids are going to die.' " Her words were unequivocal and specific and clearly expressed a threat to inflict death or great bodily injury to Martinez and his family. (See *Wilson, supra,* 186 Cal.App.4th at pp. 805–806.)

Moreover, Martinez and Sussman had a long history of conflict. Sussman made what appeared to be threats to Martinez's life while trying to purchase a gun. After hearing about them, Martinez obtained a restraining order to protect himself. In addition, Sussman admitted she was very angry and upset when she made the comments. Further, after Sussman threatened Martinez, she threw liquid at him, put feces on his truck, and went to his home twice—first trying to enter the property and later carrying a large knife while walking around outside his house. Sussman's conduct gives credibility to the threats. She did not just say she was going to kill Martinez and his family. She behaved in a way that demonstrated she was prepared to carry out her threats. Here, the surrounding circumstances confirm Sussman's statements unequivocally conveyed an immediate threat to Martinez and his family. (See *Solis, supra,* 90 Cal.App.4th at pp. 1013–1014.)

We conclude there is substantial evidence in the record to support a finding that Sussman's threat met the immediate and specific nature required in the third element of section 422.

4. *Martinez Was in Actual, Sustained Fear*

Section 422 "requires proof of a mental element in the victim[,]" that is, the victim must actually be in sustained fear. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140

10

(*Ricky T.*).)[6] Courts have interpreted sustained fear to mean "a period of time that extends beyond what is momentary, fleeting, or transitory." (*Allen,* at p. 1156; accord, *Ricky T.,* at p. 1140 [fear must last "beyond the moments of the encounter"].) Sustained fear relates to how long the victim actually experienced fear after being threatened. (See *Allen,* at p. 1156; *Ricky T.,* at p. 1140.)

The parties agree Martinez did not initially display fear after Sussman threatened him because he went to a doctor's appointment, never called his wife, and called the police hours later. The delay is understandable in the context in which it occurred. Immediately after the threat, Sussman only threw liquid at him and put feces on his truck. But after returning home from his appointment, Martinez reviewed the surveillance footage and realized Sussman went further and intruded on his property. He promptly responded to that information by calling the police.

Sussman suggests the analysis stops there, but we must consider more than just Martinez's initial actions. Martinez testified Sussman's threat "[a]bsolutely" placed him in fear. He explained: "I know Ms. Sussman. I know she's capable of this." He felt such sustained fear that two months after the incident he and his wife moved out of their house. The reasonable conclusion is that Martinez felt fear throughout the two months after the incident.

Sussman argues Martinez's move does not show that he suffered from sustained fear because he rented his home and returned after two years. She contends if Martinez experienced sustained fear, then he would have sold his

---

[6]     The threat must also "be such that would cause a reasonable person to fear for the safety of himself or his family." (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424.) Sussman does not raise this issue on appeal. Even if she had, we would find sufficient evidence supports that conclusion.

home and never returned.  We find this argument unpersuasive.  Martinez explained he wanted to return to his family property and believed two years was sufficient time for the issues with Sussman to calm down.  The jury's verdict demonstrates they found Martinez's explanations credible.  We do not reweigh the evidence or substitute our judgment for that of the trier of fact.  (*People v. Palma* (1995) 40 Cal.App.4th 1559, 1567.)

We find substantial evidence in the record to support a finding that Sussman's threat placed Martinez in sustained fear.

B.     *No Error from the Court Not Instructing on the Lesser Included Offense of Attempted Criminal Threat*

Sussman next contends the trial court erred by failing to sua sponte instruct the jury on the lesser included offense of attempted criminal threat.  Sussman argues substantial evidence supported a finding that her statement was not a real threat, and/or that Martinez did not suffer from sustained fear.

1.     *Standard of Review*

"We review de novo a trial court's failure to instruct on a lesser included offense . . . and in doing so we view the evidence in the light most favorable to the defendant."  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137, citation omitted.)  A trial court, even without request, "must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and not the greater offense."  (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.)  However, the requirement for such an instruction is only triggered when evidence of " 'the lesser offense is "substantial enough to merit consideration" by the jury.' "  (*People v. Taylor* (2010) 48 Cal.4th

12

574, 623.) "In this context, substantial evidence is evidence from which reasonable jurors could conclude ' "that the lesser offense, but not the greater, was committed." ' " (*People v. Medina* (2007) 41 Cal.4th 685, 700 (*Medina*).)

### 2. *Analysis*

Attempted criminal threat is a lesser included offense of criminal threat. (See *Toledo, supra*, 26 Cal.4th at pp. 226, 230.) A person commits the crime of attempted criminal threat by taking all the steps necessary to perpetrate the completed crime, yet the crime is not completed. (*Id.* at p. 231.) An attempted criminal threat may occur where a threat is not made directly to the intended recipient and is intercepted or for any reason fails to reach the intended victim. (*Ibid.*) It may also occur where a sufficient threat is made with the requisite intent directly to the intended victim, who for whatever reason is unafraid. (*Ibid.*) Here, the obligation to instruct on attempted criminal threat would arise only if substantial enough evidence existed from which a reasonable jury could conclude Sussman's statement to Martinez did not constitute a real threat or Sussman's statement did not cause Martinez to experience sustained fear. (See *ibid.*)

First, Sussman only makes passing reference in her opening brief that the evidence did not show her statement was a real threat. The People note Sussman failed to develop her argument, and we agree and find Sussman failed to carry her burden. (See *County of Sacramento v. Lackner* (1979) 97 Cal.App.3d 576, 591.) Further, she now claims her statements merely reflected her emotions. However, both her specific words and subsequent conduct undermine this contention. Even if we view her statements in a light most favorable to her (*People v. Millbrook, supra*, 222 Cal.App.4th at p. 1137), her words threatened death to Martinez and his family. (See *Wilson, supra,* 186 Cal.App.4th at pp. 805–806.) And as

13

discussed, her subsequent actions give credibility to her threats; after she threatened Martinez, Sussman threw liquid at him, placed feces on his truck, and trespassed twice on his property, one time with a knife and cut the electrical connection to a surveillance camera. (See *Solis, supra,* 90 Cal.App.4th at pp. 1013–1014.) This record provides a reasonable jury sufficient evidence to conclude Sussman's statements were real, not hollow, threats. (See *Medina, supra,* 41 Cal.4th at p. 700.)

Second, Sussman contends Martinez's actions after she threatened him show he was not in sustained fear. Perhaps a rational jury could conclude Sussman's statement did not initially put Martinez in fear because he went to a doctor's appointment, did not call his wife, and did not call the police until hours later. However, the inquiry does not end there. Sustained fear is the experience of fear beyond the moments of the encounter, which, as we previously detailed, is supported by the record. (See *Ricky T., supra,* 87 Cal.App.4th at p. 1140.) The facts most favorable to Sussman indicate only that there was no immediate fear because Martinez waited to complain. But the facts still indicate Martinez became very concerned about the risk to him and his family after viewing Sussman's disturbing actions captured on the surveillance video. And even after Sussman was arrested, Martinez still moved away.

Therefore, there is not sufficient evidence "substantial enough to merit consideration" from which reasonable jurors could conclude Sussman's actions and statements amounted to an attempted criminal threat instead of a completed act.[7] (*People v. Taylor*, *supra*, 48 Cal.4th at p. 623; see also

---

[7] Because we find no error, we do not address whether there was prejudice.

*Medina, supra*, 41 Cal.4th at p. 700.) Indeed, the evidence presented overwhelmingly supported that Sussman committed a completed violation of section 422.

C.      *Denial of Sussman's Motion to Unseal Juror Identifying Information*

Sussman's final contention is that the trial court erred in denying her posttrial motion to obtain personal identifying information about the jurors so she could investigate possible juror misconduct.

1.      *Additional Background*

During voir dire, juror number 4[8] disclosed she used to work for the trial judge's father. She stated that fact would not affect her ability to be impartial. Neither the People nor Sussman sought to remove juror number 4 for cause and neither party used a peremptory challenge to excuse her. Juror number 4 served as the foreperson of the jury.

On June 23, 2022, at the scheduled sentencing hearing in this case, the court disclosed that after trial juror number 4 emailed the judge's sister. The court read into the record the relevant portions of juror number 4's communication:

> I wanted to share something with you that I don't know if I was allowed to share with your brother David. I just finished a case in his courtroom today, and when we were in deliberations, this is what was said about Judge Berry from different jurors.
>
> . . . One, he was so patient and kind to everyone. Two, he always made sure we understood what was happening.

---

[8]      Although this juror is identified as juror number 5 during voir dire, the court and all further court proceedings identify this person as juror number 4. We do as well.

Three, I appreciated him letting us stand up and stretch, smiling face emoji. And four, he had total control of courtroom and quick to rein it in if things got too far. Five, I was mad at the defendant because she didn't respect him; that really bothered me.

After reading the email aloud, the judge stated that he did not find anything unusual or improper about the specific comments. Sussman placed her disagreement on the record. She argued the juror's negative comment about her, coupled with the fact that she represented herself at trial, may have improperly influenced the juror's decision. The court explained the comment was shared by juror number 4, but not made by juror number 4. The court also reminded Sussman that the jurors were advised not to let the conduct of the parties influence their decision. No further discussion about the issue took place at that hearing.

In September 2022, Sussman filed a motion to unseal juror personal identifying information.[9] Since it was unclear which juror made the comment, Sussman requested the identifying information for all jurors to determine whether the jury considered Sussman's behavior as counsel or her demeanor as a witness in reaching its verdict. Sussman argued a jury cannot base any part of its verdict on the behavior or statements of counsel, so if the jury considered her behavior as counsel in reaching a verdict, that would be unlawful. Sussman acknowledged that if the jury considered her behavior only while she testified as a witness in reaching its verdict, that would be lawful. The People opposed Sussman's motion.

After reviewing the briefs and hearing argument, the court denied Sussman's motion. It found no facts supported a reasonable belief that a

---

[9]    In June 2022, the Office of the Public Defender took over representing Sussman.

juror did not follow the law. It also found there was no showing this juror's view affected his or her verdict. It further found, as Sussman acknowledged, a juror could lawfully express this view of Sussman's attitude when she testified as a witness. The trial court further found it unlikely juror bias caused the verdict: "The evidence against [Sussman] was significant. There's videotape of her doing everything pretty much that she's charged with. . . . Her behavior is clear, and the evidence was essentially overwhelming. It was significant evidence as to all of her conduct."

The court went further, finding that it was more likely than not the juror's comment related to Sussman's behavior as a witness, rather than as an attorney. This is because Sussman represented herself very well throughout the trial. The time when someone would have found disrespect would have been when Sussman testified because the court had to remind her several times to focus her testimony on relevant issues, and Sussman expressed displeasure at the court in these instances. The court concluded Sussman did not make a prima facie showing to support a reasonable belief that juror misconduct occurred.

2.    *Rules Regarding Disclosure of Juror Identifying Information*

Code of Civil Procedure sections 206 and 237 govern the disclosure of juror personal identifying information in a criminal trial. After the court records the jury's verdict, it must seal the "record of personal juror identifying information," including "names, addresses, and telephone numbers." (*Id.*, § 237, subd. (a)(2).) A criminal defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (*Id.*, § 206, subd. (g).) "The petition shall be supported by a declaration that

17

includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (*Id.*, § 237, subd. (b).)

To demonstrate good cause, a defendant must state " 'a sufficient showing to support a reasonable belief that jury misconduct occurred.' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*).) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Id.* at p. 346.) The defendant does not need to introduce admissible evidence establishing that juror misconduct occurred, but he or she must convince the court "that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493 (*Johnson*).) Accordingly, the applicable standard of proof in these settings is whether the defendant showed sufficient evidence to support a reasonable belief that juror misconduct occurred. (See *Cook*, at pp. 345–346.)

Relevant here, subdivision (a) of Evidence Code section 1150 limits the type of evidence that may be used to attack the validity of a jury's verdict: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Evidence Code section 1150 therefore "distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' [Citation.] 'This limitation prevents one juror from upsetting

18

a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.) Thus, a statement made in the jury room may be admissible under Evidence Code section 1150 if the statement itself constitutes misconduct, but not where the statement merely reflects mental processes. (*Johnson, supra*, 222 Cal.App.4th at pp. 494–495.) Statements of bias or prejudice fall into the former category. (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 787–788 (*Grobeson*).)

We review a denial of a petition for disclosure of juror personal identifying information for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.) Under this standard, the trial court's decision may only be reversed if it "was so erroneous that it 'falls outside the bounds of reason.' [Citation.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 390 (*Bryant*).)

3.    *Analysis*

Sussman contends the following statement by a juror during deliberations established the requisite prima facie showing of good cause: "I was mad at the defendant because she didn't respect [the judge]; that really bothered me." Sussman argues this statement shows that at least one juror was biased against her as a defendant and/or a self-represented litigant, and this bias affected the verdict.

19

Although a statement of bias may be admissible evidence of juror misconduct under Evidence Code section 1150 (see *Johnson, supra*, 222 Cal.App.4th at pp. 494–495; *Grobeson, supra,* 190 Cal.App.4th at pp. 787–788), the statement here does not meet that standard. The juror said he or she was mad at Sussman because Sussman did not respect the judge. There is nothing in this statement that suggests the juror did not follow the law. Nor does the statement suggest the juror's view of Sussman's attitude affected his or her verdict. Therefore, Sussman's argument that the statement constitutes juror misconduct is speculative. There is no good cause shown when the allegations of jury misconduct are based on speculation. (See *Cook*, *supra*, 236 Cal.App.4th at p. 346.)

In addition, as Sussman acknowledges, a juror can evaluate a witness's behavior while testifying. (See CALCRIM No. 226.) Because Sussman testified on her own behalf, her attitudes and behaviors in the courtroom could properly influence a juror's view of her credibility. (See *ibid*.) And the juror's statement could simply reflect that.

Moreover, as discussed, there was substantial evidence against Sussman such that it was highly unlikely juror bias caused the verdict. The trial court found the evidence against Sussman was significant and overwhelming. We see no abuse of discretion. A reasonable person could reach the same conclusion regarding guilt as the jurors, especially considering the surveillance footage. (See *Bryant, supra,* 60 Cal.4th at p. 390.)

Sussman also argues the court applied an improper standard of proof in determining whether good cause existed because the court used a "more likely than not" standard to deny her motion. However, the record reflects the court applied the correct standard of proof. It determined whether

Sussman showed sufficient evidence to support a reasonable belief that juror misconduct occurred. (See *Cook, supra*, 236 Cal.App.4th at pp. 345–346.)

After determining Sussman did not make the required showing, the court went further. It stated it was more likely than not the juror's statement referred to Sussman's behavior as a witness. As the trial court observed, and as we noted previously, when Sussman testified as a witness, she expressed displeasure when the court reminded her several times to limit her testimony to relevant issues. A reasonable person could view Sussman's expressions of displeasure in these instances as being disrespectful to the judge. (See *Bryant, supra,* 60 Cal.4th at p. 390.)

For these reasons, the trial court did not abuse its discretion by concluding Sussman failed to make a sufficient showing to support a reasonable belief that jury misconduct occurred.[10]

## IV. DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

---

[10] Because we find no error, we do not address whether there was prejudice.